STATE, RESPONDENT, *v.* BELLAND, APPELLANT.

(No. 4,820.)

(Submitted April 11, 1921. Decided May 2, 1921.)

[197 Pac. 841.]

*Criminal Law—Homicide—New Trial—Newly Discovered Evidence—When to be Granted—County Attorney—Misconduct—Credibility of Witnesses—Erroneous Instruction.*

Criminal Law—Newly Discovered Evidence—New Trial—When to be Granted.

  1. Though a new trial in a criminal cause will not, as a rule, be granted on the ground of newly discovered evidence for the purpose of enabling defendant, charged with homicide, to introduce evidence to impeach the testimony of a witness for the state, yet where the impeaching evidence may demonstrate perjury in the witness upon whose testimony the verdict' was founded and but for which conviction could not have been had, it should be granted.

Homicide—Suppression of Testimony Adduced at Coroner's Inquest—County Attorney—Misconduct.

  2. Suppression of a portion of the testimony taken at a coroner's inquest, at which neither defendant nor her counsel was present, and of the holding of which defendant was not aware, which tes-

---

1. Power of appellate court to grant new trial in criminal case on ground of newly discovered evidence, see note in 19 Ann. Cas. 508.

2. Duty of prosecuting attorney to see that accused has a fair trial, see note in 21 Ann. Cas. 333.

timony had a tendency to disprove the charge against her, constituted gross misconduct on the part of the county attorney.

Same—County Attorney—Misconduct—Introduction of Testimony.
3. Conduct of the county attorney in repeatedly trying to get before the jury testimony that defendants, jointly charged with murder, were sustaining illicit relations, and calling the wife of one of them as a witness for the state, was reprehensible.

Same—Witnesses—Erroneous Instruction.
4. An instruction making an exception to the statutory rule that a witness false in one part of his testimony is to be distrusted in others, in favor of one who has been corroborated by other credible evidence was error.

*Appeals from District Court, Hill County; Charles A. Rose, Judge.*

PROSECUTION against Pearl Belland for homicide. From a judgment of conviction of manslaughter and from an order denying her a new trial, she appeals. Reversed.

*Mr. Victor R. Griggs* and *Mr. J. K. Bramble,* for Appellant, submitted a brief; *Mr. Griggs* argued the cause orally.

*Mr. Wellington D. Rankin,* Attorney General, and *Mr. L. A. Foot,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Foot* argued the case orally.

Counsel for appellant assert that "counsel for the state, by putting to witnesses certain questions which assume facts prejudicial and degrading to the defendants, and also in making certain statements during the argument of the case, outside of the evidence, and which assumed facts prejudicial and degrading to the defendants, were guilty of misconduct, so gross and so prejudicial to the defendants, that they did not have a fair and impartial trial." Admitting, for the sake of argument that counsel for the state asked improper questions of certain witnesses, or made improper statements, that, in itself, does not constitute such misconduct of counsel as to warrant a reversal of the verdict, or the granting of a new trial. In the case of *State* v. *Rhys,* 40 Mont. 131, 105 Pac. 494, this court, speaking through Mr. Justice Holloway, said: "It will not do to draw the inference of misconduct on the

part of the county attorney from the mere fact that he has asked questions which ought not to have been asked. In order to constitute such misconduct, the questions must be so far improper that' it would amount to an impeachment of the legal learning of the attorney to say that he did not know that they were manifestly improper and wholly unjustifiable.'' And again in *State* v. *Barrett,* 43 Mont. 502, 117 Pac. 895, Mr. Justice Holloway said: ''It will not do to convict an attorney of misconduct in asking questions which the trial, or appellate court, may determine to be improper.'' In the case of *State* v. *Jones,* 48 Mont. 505, 139 Pac. 441, cited by appellant, a different condition existed. In that case, the trial court overruled the defendant's objections to the objectionable questions of the prosecuting attorneys and allowed the witnesses to answer, and thereby, as this court said: ''Stamped with approval the course pursued by the county attorney, thus emphasizing the error committed.''

In the case at bar, the trial court, with one exception, sustained the objection of the defendant to the alleged proper remarks and questions of the prosecuting attorneys every time such objections were offered, and doubtless would have warned the jury to disregard the said remarks and questions, had the appellant so requested, but the record nowhere discloses such a request on the part of the appellant or her counsel. In order that improper remarks of counsel may entitle the opposing party to a new trial, such party must have called the court's attention to the remarks when made, and have asked to have the jury warned against them. (*Pascoe* v. *Nelson,* 52 Mont. 405, 158 Pac. 317.)

Newly discovered evidence of contradictory statements made by a witness before a trial is no ground for a new trial. (*Chalmers* v. *Sheehy,* 132 Cal. 459, 84 Am. St. Rep. 62, 64 Pac. 709; *Husted* v. *Mead,* 58 Conn. 55, 19 Atl. 233; *Miller* v. *Potter,* 102 Ill. App. 483; *Brennan* v. *Goodfellow* (Iowa), 96 N. W. 962; *Gardner* v. *Kellogg,* 23 Minn. 463; *Garfield Mining & M. Co.* v. *Hammer,* 6 Mont. 53, 8 Pac. 153; *Leyson* v.

*Davis,* 17 Mont. 220, 31 L. R. A. 429, 42 Pac. 775; *Kennedy* v. *Plank,* 120 Wis. 197, 97 N. W. 895.)

The sole purpose of this alleged newly discovered evidence of the statements made by the witness, Jaber, is to impeach him as a witness, and bring it squarely within the rule laid down in the above-cited cases, and is not sufficient to warrant a reversal of the lower court in denying appellant a new trial.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Harry Robinson and Mrs. Pearl Belland were charged jointly with the murder of Matt Ulmer and were convicted of manslaughter. Thereafter Robinson was granted a new trial, but defendant Belland's motion was denied and she appealed from the judgment and order.

Appellant relies for a reversal upon the refusal of the court to grant a new trial upon the following grounds: (1) Newly discovered evidence; (2) the giving of certain instructions requested by the state. She also predicates error upon the alleged misconduct of the prosecuting officers.

(1) To illustrate the first assignment, a brief review of the facts as disclosed upon the trial is necessary. The homicide occurred August 14, 1920, on the public road in front of the Ulmer home, some thirty miles north of Havre, in Hill county. About 10:30 o'clock on the night of August 12, the deceased was observed lying in wait with a gun near his home, and, in reply to an inquiry as to his purpose, stated that he was in wait for the defendants and would "get them" if they came that way. This information was conveyed to the defendants on the following day and they then armed themselves with an automatic pistol. On the afternoon of the 13th the defendants passed the Ulmer place, and Robinson upbraided Ulmer for his conduct the evening before, with the result that a war of words ensued during which invitations to fight were exchanged but without acceptance, and defendants went on their way. On the morning of the 14th the defendants in a farm

wagon started for their respective homesteads upon a road which led by the Ulmer home. When they approached the Ulmer house they were hailed by Ulmer, who, applying a vile epithet to Robinson, invited him to get out of the wagon and fight. Robinson accepted the invitation and the two men came together, Robinson striking and Ulmer clinching. They fell to the ground with Ulmer on top, and immediately Gus Hinze, the former husband of Mrs. Belland, came from the Ulmer house with an empty quart beer bottle and struck Robinson over the head with it until the bottle broke, and then with the jagged edge of the bottle neck struck Robinson in the eye. Mrs. Belland called to Hinze that he could not kill Robinson and fired two shots at Hinze, neither of which took effect. Hinze ran into the house and secured a gun. Robinson and Ulmer were still fighting on the ground—Ulmer on top—but neither inflicting any injury upon the other.

To this point in the narrative there is not any substantial conflict. Hinze testified that he did not hear a third shot or know what transpired while he was in the house, but that when he returned, Ulmer had been shot; that he pointed the gun toward Mrs. Belland and pulled the trigger but the gun proved to be unloaded; that he returned to the house, secured ammunition, and when he appeared again the defendants were in the act of leaving, and that they drove away rapidly. Solomon Jaber, who assumed to be an eye-witness to the tragedy, testified for the state that after Mrs. Belland fired the two shots at Hinze, she alighted from the wagon and, approaching within two or three feet of the two men on the ground, pointed the pistol at Ulmer and fired two more shots, one of which took effect and caused Ulmer's death. Ulmer was shot through the body diagonally from the right shoulder blade, the bullet pursuing a slightly downward course.

This, in brief, is the case made by the state, and it will be observed at once that, without the testimony of Jaber, the person who fired the fatal shot would not be identified and neither would there be present anything to indicate the cir-

cumstances under which the shot was fired; in other words, without the testimony of Jaber there would not be evidence sufficient to take the case to the jury.

The only other persons present were the two defendants. Mrs. Belland testified that when Hinze commenced beating Robinson on the head with the bottle she called to him that he could not kill the man, and, alighting from the wagon, shot at him twice, but missed; that Hinze ran into the house, secured a gun and shot at her once without effect but still kept the gun pointed at her; that Ulmer then arose from off of Robinson and came to where she was standing and tried to take the pistol from her or turn it upon her; that in the struggle over the possession of the gun, one of her hands was injured; that she called to Robinson for help; that Robinson came to her assistance, his head and face covered with blood; that he seized Ulmer by the shoulders and turned him partly around, and that then, with knowledge of the fact that Hinze still had her covered with his gun, and realizing Robinson's weakened condition and her peril, and mindful of the threat made by Ulmer the evening previously and Hinze's repeated threats to kill her and Robinson, she fired at Ulmer and he dropped to the ground; that she fired but three shots altogether and did not know that Ulmer had been killed until told later by his brother. Robinson testified substantially to the same facts, and in some details Mrs. Belland was corroborated by other witnesses. These defendants were present and knew what transpired. If their story is true, the case presented is one of justifiable homicide.

Without Jaber's testimony the state could not make out a case. His story is indispensable to the conviction of either defendant, and it was therefore of the utmost consequence that he should have occupied a position from which he could see and know all that transpired after the two shots were fired at Hinze. Upon the trial Jaber testified that during the entire controversy, and until after the fatal shot was fired, he was standing in the road near the east end of Robinson's

wagon, and about twenty-five feet from where Robinson and Ulmer were fighting on the ground; that his vision was unobstructed; that he saw everything that occurred; that he was not unduly excited and did not fear for his own safety.

In support of the motion for a new trial, there is presented the affidavit of George E. Herron, deputy sheriff of Hill county, to the effect that he was present at the Ulmer home on August 16 when the coroner's inquest was held; that Jaber was the only witness examined at that time; that during the course of his examination, the coroner, the deputy county attorney who was conducting the examination, the affiant, the witness Jaber, and others, left the house in which the evidence was being taken and went out upon the road to the place where the trouble occurred; that Jaber there re-enacted his part as of the time of the tragedy; that he designated where he stood when the shooting commenced, as a point in the road a few feet south and east of the Robinson wagon, and stated that when the shooting began he ran for cover behind the wagon, placing a water barrel in the wagon between himself and the shooting, and then jumped over the fence along the south side of the road and was some six feet south of the fence when the shooting ceased; and that he was greatly excited and feared for his own safety.

In his affidavit, the coroner recites the fact that the several parties left the Ulmer house during the examination of Jaber and went upon the road; that Jaber told what happened during the shooting and illustrated where he was and what he did at that time; that affiant does not remember where Jaber said he was when the shooting was started, nor what he did immediately thereafter, except that he does remember that Jaber then and there said that he jumped over the wire fence on the south side of the road and that he was very much excited and afraid for his own safety.

From other affidavits it is made to appear that after Jaber had concluded his exhibition and statements on the road, the parties returned to the Ulmer house where a slight correction

was made in the testimony concerning certain distances; and the testimony was then closed without incorporating the statements which Jaber had made while out on the road. It is made to appear, further, that neither of the defendants knew that an inquest was to be held on August 16 and neither was present in person nor represented by counsel; that defendants and their counsel relied upon the coroner's report as containing a full, true and correct statement of all the testimony given by Jaber at the inquest, and were not aware that he had told a different story until after the trial was concluded. There were not any counter-affidavits presented.

Confessedly, the purpose of this newly discovered evidence [1] is to impeach the witness Jaber, and for the purpose of introducing such evidence a new trial will not be granted as a rule, and the reason is apparent. If the moving party has had a fair hearing, with ample opportunity to prepare his case and fend against the possibility of perjury, he cannot reasonably demand more, and the smart of defeat and the certainty of the consequences offer too great a temptation for him to manufacture a plausible showing in support of his motion; but there are exceptions to the rule of which this court has taken cognizance.

In *State* v. *Matkins,* 45 Mont. 58, 121 Pac. 881, we announced the rules which govern generally the application for a new trial on the ground of newly discovered evidence. Among those rules are the following: The new evidence must not be cumulative merely, and it must not be such as will tend only to impeach the character or credit of a witness. Concerning the rules, this court said: "To some of these there may be, and doubtless are, exceptions. For illustration: The cumulative evidence may be so overwhelmingly convincing as to compel the conclusion that to sustain the verdict would be a gross injustice, or the impeaching evidence may demonstrate perjury in the witnesses upon whose evidence the verdict is founded."

In 12 Cyc. 736, the same exception is stated as follows: "Where it is discovered after verdict that a witness for the prosecution deliberately perjured himself and the accused would not have been convicted except for his testimony, he is entitled to a new trial for newly discovered evidence."

It is apparent that if these affidavits state the facts, a material portion of the testimony given by Jaber at the inquest was suppressed, and if he told the truth at the inquest, he committed perjury at the trial. At best, his testimony as it appears from this record is unsatisfactory. He was impeached upon other matters, and, since he was the only witness for the state who assumed to know the circumstances immediately surrounding the killing, a conviction ought not to rest upon his testimony alone, viewed in the light of the facts disclosed by these affidavits. If upon a new trial the facts are developed as indicated by the affidavits, it is inconceivable that a jury would believe the story told by Jaber upon the first trial.

Other so-called new evidence, material to the defense, is set forth in the affidavits, but the excuse tendered for not having made discovery of it before trial is insufficient.

(2) Although the deputy county attorney was not required [2] to participate in the inquest, he was present and conducted the examination of Jaber and must assume at least a part of the responsibility for the suppression of that portion of the evidence given by the witness while upon the road. Sections 9668 and 9669, Revised Codes, require that the testimony taken at a coroner's inquest shall be reduced to writing and filed with the clerk of the court. These statutes do not confide to the officers the right to select such testimony only as will tend to establish the commission of the crime and omit evidence which has a contrary effect. If the entire story told by Jaber had been incorporated in his deposition, these defendants and their counsel could not have been misled to their prejudice, but would have been prepared to meet the testi-

mony given by the witness at the trial. Assuming that the deputy sheriff has stated the facts in his affidavit, the prosecutor was guilty of gross misconduct in omitting from Jaber's deposition the testimony which disclosed that the witness was not in a position to see or know what transpired at the time the fatal shot was fired.

Likewise the repeated efforts of the county attorney to [3] get before the jury something that might indicate that these defendants were sustaining illicit relations, and his action in calling as a witness for the state, the wife of defendant Robinson, cannot be justified from any viewpoint. Since, however, a change has been effected in the personnel of the county attorney's force, a repetition of these offenses will not likely occur, and we refrain from further comment.

(3) Instruction No. 5, given by the court, correctly defines manslaughter, and we are not prepared to say that it was inapplicable to the facts.

Instructions 7 and 8 state correctly abstract rules of law and are subject to criticism only in that they are not made applicable to the facts of the particular case.

Instruction 19 should not have been given, as there is not any foundation for it in the evidence.

Since this cause must be remanded for a new trial, attention [4] is directed to Instruction 24, to which exception was not taken. It is essentially erroneous, and a like instruction has been condemned by this court so often that it seems inconceivable that the error could be repeated at this late day. Section 8028, Revised Codes, provides "that a witness false in one part of his testimony is to be distrusted in others." No exception is made in favor of the testimony of such a witness corroborated by other credible evidence and the courts are without authority to write in such an exception. (*State* v. *Penna,* 35 Mont. 535, 90 Pac. 787; *State* v. *Connors,* 37 Mont. 15, 94 Pac. 199; *State* v. *Kanakaris,* 54 Mont. 180, 169 Pac. 42.)

For the reasons assigned, the judgment and order are reversed and the cause is remanded to the district court of Hill county for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS and COOPER concur.

MR. JUSTICE GALEN: I concur in the result reached. In view of the facts disclosed by the record, I believe the defendant Pearl Belland is entitled to a new trial, subscribing as I do to many of the statements contained in the majority opinion, but I cannot agree with the view expressed that the testimony of the witness Solomon Jaber is indispensable to warrant the conviction of the defendant Belland. Nor do I concur with the statement contained in the opinion that ".without the testimony of Jaber, the person who fired the fatal shot would not be identified, and neither would there be present anyone to indicate the circumstances under which the shot was fired; in other words, without the testimony of Jaber there would not be evidence sufficient to take the case to the jury."

A reading of the evidence and consideration of the facts disclosed by the record, in my view, lead to the formation of opinion that the homicide was committed by the defendant Pearl Belland. The death of Matt Ulmer by gunshot on the morning of August 14, 1920, is proved and in my opinion there is sufficient evidence, independent of the testimony of Solomon Jaber, to present a case for submission to the jury.

The witness John J. Lynch testified that two or three days before the homicide he met the defendant Pearl Belland, in company with Harry Robinson—on the 11th or 12th of August—and had a conversation with them at Pete Ulmer's place, in the presence of Pete Ulmer and family; that Mrs. Belland asked the witness if he had a gun and the witness said he did not have one with him but had one over home,

and the witness did not give them permission to use it. The gun referred to was always kept by the witness on top of the kitchen cabinet. It was a 32-automatic Colts, identified by the witness as State's Exhibit 2, and the shells were identified as State's Exhibit 3. The witness stated that he missed the gun the day after the killing.

The witness John C. Lynch testified that he had a conversation with Pearl Belland and Harry Robinson the night of the 12th of August, two days before the homicide, and they asked him if he had a gun and he replied that he had not, but that there was one there that belonged to the boy. They then inquired of the witness if he thought the boy would let them have it, and the witness told them the boy would not loan his gun to anybody. Witness told them the gun was on top of the kitchen cabinet. It was a 32-Colts automatic. On the night following, and just preceding the day of the homicide, August 13, the witness again met Harry Robinson and Pearl Belland, and the defendant Pearl Belland asked the witness if he missed anything over there, and witness replied in the affirmative. Robinson thereupon exhibited the gun to the witness and asked witness about the safety and how it worked. The witness identified State's Exhibit No. 2 as the gun belonging to his son, and that there were six shells in the revolver when he last saw it on the cupboard.

Wilfred Ulmer, ten year old son of the deceased, testified that he was at his father's place at the time that his father and Harry Robinson had trouble on the day of the homicide and that Harry Robinson jumped off the wagon and engaged "in a 'mixup' with my papa." "I couldn't hear what they said very plain and I went behind the house and when I looked out again, Mr. Hinze and my father were on top of Harry; they began to fight and then Mrs. Hinze jumped off the wagon and I don't know what she did; then she shot; then Hinze he ran into the house and I didn't see him after a while, but I seen him run into the house and when I looked out again, I seen my father lying dead; nobody shot besides

Mrs. Hinze or Mrs. Pearl Belland; I don't know how far she was from my papa, when she shot at him; Harry Robinson and Mrs. Hinze they both jumped into the wagon and they began to run; the horses began to run; Harry was sitting on the box; I couldn't see Mrs. Hinze; I didn't see Mrs. Hinze shoot at all, but I heard the noise of it; I did not see her have the gun in her hand; I did not see her point something towards my papa; I could tell she shot my papa, because I heard the noise; * * * when Mrs. Belland or Mrs. Hinze and Mr. Robinson left, I went to my papa; he was dead."

Gustav Hinze testified that the defendant Mrs. Belland was his former wife and that on the 14th of August, the day of the homicide, at about 10 o'clock in the morning, he was at the Matt Ulmer place, and that he saw the defendant Pearl Belland and Harry Robinson there at that time, and that from the south window of the house he observed the deceased and Harry Robinson lying on the ground in some kind of a struggle, Ulmer, the deceased, being partly on top. The witness ran out with a beer bottle and hit Harry Robinson over the head with it, and in the meantime heard a shot fired and then a second shot which came close to the witness. He did not know where the first shot was fired, though stated that Pearl Belland fired it. The witness did not have any gun when he went out the first time, nor did Matt Ulmer. When the first and second shots were fired, the witness was down on his knees by Harry Robinson and Matt Ulmer and at that time had struck Robinson with the bottle. As the witness got up, the defendant Pearl Belland was standing right behind him, about eight feet away from the witness, when the accused, Pearl Belland, fired the last shot. Further, he testified: "I think she was about six foot from Matt Ulmer's shoulder when she pointed the gun at Matt; I heard three shots fired altogether; the third one took effect; I didn't hear that shot; I must have been in the house; all I heard was two shots; Harry Robinson and Matt Ulmer were still

struggling when I went in; I went into the house and got the shotgun and came out with the shotgun and when I got out Pearl Belland was standing behind the. wagon and I didn't look at Harry Robinson. I kept my eye on Pearl Belland; Matt Ulmer at that time was laying down on the ground; he had been shot; I could see on the clothes, where the bullet entered; up in the back; that shot took place while I was in the house; * * * Harry Robinson got into the wagon in about a minute or two; when I came out with the gun, it was empty, but I didn't know it at that time; so I opened the gun and looked at it, and there was no shell in it; it was a breech-loader, a shotgun; I goes back into the house where the cupboard was and put a shell into the shotgun and I seen that Harry Robinson was standing at the front wheel of the wagon; and I reached over and got a handful and then I ran out of the house and run north and watched the two, and the first thing I knew, Harry Robinson was hitting the horses and they was running the horses down the road; Mrs. Belland was laying in the wagon-box; * * * I didn't go toward them; I didn't see the .shot fired that killed Matt Ulmer; there was no other gun on the Matt Ulmer place except the shotgun; I did not shoot the shotgun off at all; I struck Harry Robinson with the bottle once; when I struck him with the bottle, Matt Ulmer was on top; neither of them was doing anything; as near as I can see, Harry Robinson had Matt Ulmer by the throat; they had each other by the throat; that is about as much as they were doing; there was not exactly any bad feeling between myself and my wife at that time; I told Harry Robinson last winter to keep off the place; there was some bad feeling between Harry Robinson and myself."

And on cross-examination, witness testified in part as follows:

"When I went in the house, Harry Robinson and Matt Ulmer were still fighting and Ulmer was on top of him; when I went the first time to get the shotgun, Matt Ulmer wasn't dead; after that I don't know what happened—between Harry

Robinson, Matt Ulmer and Pearl Belland; when I went to the house, I saw her pointing the gun at Matt Ulmer; I didn't hear any shots fired then; all I saw was her point the gun at him; he was still alive at that time; from then on, I don't know what happened between Matt Ulmer, Harry Robinson and Pearl Belland and I heard no more shots after that.''

And from the testimony of Dr. J. S. Almas, it appears that he performed the post-mortem on the body of the deceased, found a bullet wound therein, and extracted the bullet from it. He testified:

''The wound of entrance was on what is known as the spine; the right scapula, a little below the center of the spine; the bullet wound was on top of the spine and went diagonally downward and a little forward to the left, the wound appearing about two inches to the left of the left nipple and about an inch above the left nipple; there was another wound in the arm, that ran slightly downward; the bullet laid about two inches below the skin of the arm; the bullet went through the body at the sixth dorsal vertebrae; it must have cut the cord; this bullet wound was the immediate cause of death; a person would ordinarily live only a few minutes after receiving such a wound; in every other respect, his body seemed to be that of a healthy person.''

Witness Charles A. Sartain was at the Matt Ulmer place immediately after the homicide and picked up some of the empty shells lying on the ground near the body, which were identified and introduced in evidence. He said:

''There was some evidence of a scuffle on the ground between the house and where the body lay; the hats were laying about a rod from the body, towards the house; you could see that the ground was kind of torn up all right where the people were scuffling; there was evidence of a scuffle there; they were lying pretty close together; there was no evidence of scuffling further north where the hats lay; I picked up the shells right by the body; one of them was found about the middle of Matt's body lying right by the side of him, not a

foot away, and almost under him, and the other one was about a foot and a half or two feet away on the east side of the body, I think, after the doctor came and turned him over; one shell was right under him; some one picked it up when the doctor turned the body over.''

Mrs. Pete Ulmer testified that on August 14, the day of the homicide, Mrs. Pearl Belland and Harry Robinson were at her house, and that the witness was at the time keeping a child for the defendant Pearl Belland; that Robinson and Pearl Belland came to the house of the witness about 11 o'clock of the forenoon, about the 12th of August, and that they remained there on the nights of the 12th and 13th of August, and that on the morning of the 14th they hitched up and left, starting north, and then came back between 10 and 11 o'clock of that day. Witness testified: ''They told me they were going to get water and were intending to bring coal along, and said that Matt Ulmer held them up on the way and how the fight started; Mrs. Belland said that they were shooting but she didn't know what happened; later Sam Jaber came along and said Matt was dead; later my husband came home and she asked him if he was dead and he said 'Yes'; she didn't say nothing but she laid right down on the bed and cried bitterly; she didn't want to kill him; she said she was shooting, but she didn't say who she shot; she didn't say who she intended to shoot; she told me that she shot at Matt Ulmer, but she didn't know if he was dead or not; she told me that she did not intend to harm anybody.''

And Peter Ulmer testified that about 11:30 on the day of the shooting Mrs. Belland and Harry Robinson were at his place upon his return from his brother's (Matt Ulmer) place after the shooting, and the witness testified:

''Mrs. Belland asked me if my brother was dead; I said 'Yes,' and then she fell backward on the bed; she said it was an accident; she didn't try to kill him; she said afterward she didn't intend to kill Matt; she admitted that she shot him;

she did not say who she intended to kill; she said she shot twice at Hinze but she missed him.''

Eliminating the testimony of Solomon Jaber entirely from consideration, as I have in this review of the state's case, we have not the direct testimony of any eye-witnesses to the firing of the fatal shot, although we have the admissions made by the defendant Pearl Belland immediately after the shooting and the circumstances in connection with her possession of the pistol and discharging of at least two shots therefrom at the time of the struggle between the deceased and Harry Robinson, all of which I believe sufficient to warrant a case for the jury. All evidence is more or less circumstantial, whether consisting of facts which permit the inference of guilt, or given by eye-witnesses to the occurrence. It is generally understood and appreciated that even as to the testimony of eye-witnesses, the same is more or less circumstantial as to observations of persons, impressions and narrations of events; that it will differ even though all are in position to have the same perspective. There is a difference between evidence consisting of facts of a particular nature, and, hence, giving rise to presumptions, and evidence which is direct, consisting in the positive testimony of eye-witnesses; and the difference is material according to the degree of exactness and relevancy and the weight of the circumstances and credibility of the witnesses.

But, the circumstantial evidence admitted, coupled with the admissions made by the defendant Pearl Belland, in my view of this case, do not warrant a conclusion that the testimony of the witness Solomon Jaber is indispensable.