STATE, RESPONDENT, *v.* HAMILTON, APPELLANT.

(No. 6,632.)

(Submitted April 9, 1930. Decided May 3, 1930.)

[287 Pac. 933.]

354

*Mr. D. L. O'Hern, Mr. George J. Murphy* and *Mr. H. C. Crippen,* for Appellant, submitted a brief; *Mr. O'Hern* and *Mr. Crippen* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. S. R. Foot,* Assistant Attorney General, and *Mr. Rudolph Nelstead,* County Attorney of Custer County, for the State, submitted a brief; *Mr. Nelstead* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Alex Hamilton, has appealed from a judgment of conviction of the crime of grand larceny and from an order denying him a new trial.

By information filed by the county attorney of Custer county, Hamilton was charged jointly with Jock McDonald with the theft of a horse belonging to one Dem Elias on the ninth day of November, 1928, to which information the defendants entered pleas of "not guilty" and on which they demanded separate trials. The trial of the defendant Hamilton commenced on March 20, 1929; it lasted three days and resulted in a verdict of guilty. The trial of McDonald followed immediately upon the same testimony, except that certain additional witnesses appeared on behalf of the defendant, and resulted in a verdict of not guilty.

After judgment entered against him, defendant Hamilton moved for a new trial on the grounds of errors alleged to

have been committed on the trial and newly discovered evidence, supported by affidavits.

Counsel for the defendant contend that the court erred in admitting testimony as to a statement made by defendant prior to the trial without requiring the prosecution to lay a foundation which would justify the admission in evidence of a confession; in giving, over their objection, an instruction purporting to define "principals in any crime," and refusing to give an offered instruction on "alibi." It is further contended that the evidence is insufficient to justify the verdict and judgment. As to the order denying a new trial, counsel contends that the court erred in not holding the showing made sufficient to warrant a new trial on the newly discovered evidence, and in holding that misconduct of special counsel for the prosecution was not sufficient to warrant a new trial. These matters will be considered in the order argued, after summarizing the evidence adduced.

Alex Hamilton is a rancher and sheep man who had lived in the vicinity of Ismay, Custer county, for many years, and in November, 1928, was living in that town. On November 5 Hamilton inquired of F. J. Frazier, a buyer for a "horse products" concern, regarding the market and prices paid for horses, telling him that he (Hamilton) owned no horses but had a friend who "would have around two hundred." The "friend" was McDonald, who did own horses. Frazier called McDonald on the telephone at Miles City on November 7 and thereafter talked with him at Ismay concerning the matter, and later sent a man by the name of Cunningham, who was in his employ, to look at horses held by McDonald, and at Frazier's request Hamilton went with Cunningham to show him where the horses were, according to Frazier's testimony on behalf of the state. During all of the time covered by the testimony, Frazier was incapacitated by an injury received in an automobile accident, sickness, or intoxication, or a combination of the three.

On November 9 a large number of horses was gathered in the vicinity of Ismay by five men, one of whom rode a gray horse. The witnesses to these facts were too far away to identify any of the riders. A drove of horses, in which the horse described in the information was later found, was corralled at the stockyards after nightfall and thereafter loaded into cars ordered by the horse buyers. A witness testified to seeing McDonald thereafter in Ismay on a gray horse.

There is substantial evidence to the effect that the horses gathered were placed in the "McNamara pasture," and that Hamilton went with the assistant horse buyer to that pasture, although Hamilton testified that he took the horse buyer to a different place to see the McDonald horses and went to the McNamara ranch for another purpose, and in this he is corroborated by another witness. Yet, again there is doubt cast on the testimony for the defendant in this respect by rebuttal testimony for the state. There is evidence in the record that Hamilton, on the afternoon of the 8th, borrowed a "pinchbar" which is used for "spotting cars," and that this bar was at the stockyards at the time the horses were loaded.

The most damaging testimony against Hamilton was given by Arthur Scheibel, a farmer living about twenty-five miles from Ismay, who brought a load of hogs to Ismay for shipment on the afternoon of November 9; the hogs were transported in a truck driven by one Howard Myers. Scheibel testified that he went to the stockyards "toward evening" to feed the hogs and, while doing so, the drove of horses arrived in charge of five men, and that, while he was not acquainted with Hamilton, he had met him on the road and had seen him in Ismay, and that Hamilton was present assisting in loading the horses. Four cars were moved up to the chute and loaded with horses while this witness was feeding and watering his hogs and assisting in moving the cars. It seems clear that, according to his testimony, the witness was present at the stockyards continuously from the time the horses were brought in until the cars were fully loaded. It later developed that

it was quite dark during the time of loading and, according to the witness, a man called "Alex" requested one called "Jock" to get a lantern, which he did. The lantern was used for a short time but went out for lack of oil.

The defense contends that the witness' identification of Hamilton is based solely upon this conversation, as it was too dark for him to have seen the man. However, on cross-examination the witness was being interrogated concerning his statements on direct examination. He was asked, "As I understood you a while ago, you said it was so dark you couldn't tell the color of the horses they were riding—" The witness broke in, "but later on—" The question was completed, "except one gray horse?" "A. Later on. It didn't take very long to get dark so you couldn't identify them any more, but I just knew one gray horse. I could tell the fellow who was riding the gray horse if I saw him." But he later testified that he did not see Hamilton until he was moving the cars, which was, presumably, after it became dark. Later the witness told the stock inspector that he could not be sure as to who the men were he saw loading the horses, but stated, "I know the man if I see him," and told the stock inspector the names used while the horses were being loaded. This witness testified that he saw no light used while the horses were being loaded, other than the lantern. On the stand the witness was positive of his identification of Hamilton as one of the men who were loading the horses.

One John Lackner testified that he was section foreman at Ismay in November, 1928, living at the section-house, but his family was not there at the time; that he went to bed about 8 o'clock on November 9, but was later awakened by Jock McDonald, to whom he loaned a lantern; he did not know the exact time, as he was awakened from a sound sleep.

James Meehan, sheriff of Prairie county, testified that he went to Ismay in response to a call on the morning of November 10, 1928, and there met Frazier, the horse buyer, Cunningham, and Hamilton in a hotel room; that he indicated

Hamilton and asked Frazier if this was the man he "bought the horses from," to which Frazier made no response at first but later said "the sheep man." The witness continued: "I said, 'Alex Hamilton?' He said 'yes' and I said, 'Is this Alex Hamilton?' He said 'yes.'" The witness took Hamilton and Frazier to Terry, without a warrant, and there had a conversation with Hamilton regarding the horses. The witness was asked to give the conversation, to which the objection was interposed that it was impossible to tell from the question as to whether or not the state was attempting to prove a confession and no foundation had been laid therefor. Preliminary questioning disclosed that no threats were made or inducements held out to the defendant, but that the sheriff did not advise him that anything he said might be used against him. The witness testified that he had not put the defendant under arrest, but had taken him to the courthouse for questioning. The objection was overruled, and the witness related the conversation as follows: "I told him I thought it was kind of foolish for him to get mixed up in this affair, a man in his business like he is, in sheep, and he said he understood this man Frazier was going to take out a number of horses out of there, four or five hundred head, and he thought it was a good thing to rid the range of them horses."

1. The contention first made is that error was committed in admitting the sheriff's testimony respecting the conversation related and thereafter not striking it on motion.

The statement attributed to the defendant by the witness Meehan was in no sense a "confession"; at most, it was an admission which, taken in connection with other facts and circumstances shown, tended to show guilt or tended to show the mental attitude of the defendant toward the class of property stolen and the likelihood of his having committed the crime. For the admission of such a statement it is not necessary that a foundation be laid as for the admission of a confession. (*State* v. *Stevens*, 60 Mont. 390, 199 Pac. 256.)

2. The court gave the substance of section 10732, Revised ▮ Codes 1921, as an instruction on who are principals in the commission of a crime. The objection to this instruction is that it gave the jury two theories on which the defendant might be convicted; the one that the defendant was present and directly committed the crime, as stated by Scheibel, or, not being present, aided and abetted McDonald. That such result might follow from the giving of the instruction does not necessarily condemn it. If the facts, as a whole, in a given case, would justify the jury in drawing the inference that another was the "titular principal" and the defendant on the trial aided and abetted him in the commission of the offense charged, such an instruction is proper. (*State* v. *Wiley,* 53 Mont. 383, 164 Pac. 84.)

Here the state was proceeding upon the theory that this defendant was equally active with McDonald in the commission of the offense, and it is at least doubtful whether, if the jury did not believe the testimony of Scheibel, this defendant could have been convicted on the theory that, not being present, he had guilty knowledge and intent in aiding McDonald in disposing of horses. While we do not say that the giving of the instruction constituted reversible error, if the case is to be retried on the theory adopted, this instruction should not be given.

3. It is contended that the court erred in refusing to give ▮ defendant's offered instruction on "alibi." This instruction was fully covered by the court's instruction No. 16; but counsel for defendant now assert that the instruction given was erroneous in that it advises the jury that the defendant was not required "to prove that defense beyond all reasonable doubt," instead of beyond *a* reasonable doubt.

No objection to the instruction given was interposed at the time the court was settling the instructions, and the attack upon the given instruction cannot now be considered. (*State* v. *Cassill,* 71 Mont. 274, 229 Pac. 716.) As said, the offered instruction is covered by the instruction given and no error

was committed in refusing it. In passing, we suggest that the use of the phrase "all reasonable doubt" might be confusing to jurors and the use of the familiar term "a reasonable doubt" is recommended in all instructions dealing with the subject.

4. We have carefully considered the evidence and are convinced that, while it is not strong, it is sufficient to support the verdict and judgment. Although some doubt is cast upon the accuracy of Scheibel's recital of what took place at the stock-yards on the night in question, this doubt was resolved in favor of the·prosecution by the jury, and we cannot say that his story is either so improbable or contrary to nature that, as a matter of law or fact, it is unbelievable.

5. While the defendant was on the stand he was asked if he ▆▆▆ ever loaded horses at night, to which he replied that he had shipped the last of his horses in 1919. Special counsel for the state then inquired: "Was that the time you were tried in this court and convicted of maliciously altering brands?" The court promptly sustained an objection to the question and stated, "You are admonished to disregard the remarks of counsel."

If it was a fact that the defendant had been theretofore convicted of altering brands on animals belonging to another, with the intent to steal, or prevent identification of, such animals, a felony (sec. 11211, Rev. Codes 1921), it was proper for the state to impeach him as a witness by showing such conviction either by cross-examination or production of the record of the judgment (sec. 10668, Id.). However, the question as propounded was objectionable, even for the purpose of impeach-ment; it assumed the fact of conviction and required the witness to answer whether or not the time fixed was the time of such conviction. Although the state thereafter introduced evidence for the purpose of impeaching the witness on the ground that his reputation for honesty and integrity was bad, it did not attempt thereafter to show that he had, in fact, been convicted of a felony. Whether or not the impression made upon the jury that such was the fact (not proven) was removed by

the court's admonition, of course, we cannot say, but the court did all in its power to remove that impression (*State* v. *Cornish*, 73 Mont. 205, 235 Pac. 702), and, as a new trial must be granted on other gounds, we need not further discuss the matter. We assume that, on a retrial, if counsel for the state desire to impeach the defendant as a witness by showing a former conviction, if he has heretofore been convicted of a felony, they will proceed in the manner prescribed.

6. It will be remembered that the conviction of the defendant depended largely upon the truth of the testimony of the witness Arthur Scheibel, to the effect that he was present at the stock-yards continuously from about the hour of 6 P. M. until the horses were finally loaded, and there saw the defendant engaged in the work of loading; that it was dark and during the period required for the work the defendant directed his co-defendant McDonald to get a lantern, which the latter secured from the witness John Lackner. The witness Lackner testified that he saw McDonald at Fulton's barn in Ismay with a gray horse between 7 and 8 on the night the larceny is charged; that he went to bed about 8 and was later awakened by McDonald to whom he loaned the lantern, but could not say what time it then was.

In support of his motion for a new trial defendant presented the affidavits of five persons who were not witnesses at the trial, in addition to his own and that of his two attorneys.

The first of these is the affidavit of Dr. J. N. Smith, of Ismay, who states therein that he was present, on the fence of the stock-yards, during the loading of the horses, which process occupied about forty-five minutes, beginning soon after 6 o'clock, and that no lantern was used in loading the horses.

Mabel E. Jordan made affidavit that from 6:30 to 8 or 8:30 on the evening of November 9, the witness Lackner, with his wife and granddaughter, were riding with affiant in her car around the town of Ismay; that they passed the Fulton barn, driving slowly, and the lights of the car fell full upon it;

that there was a gray horse in front of the barn, but that neither McDonald nor any other person was near the horse.

Howard Myers, who brought Scheibel's and his hogs to Ismay, makes affidavit that, between 6 and 6:30 on the night of the 9th, he had supper with the witness Scheibel and that, when he left Black's restaurant at 6:30, Scheibel was engaged in conversation with Mrs. Black.

By the affidavit of Mrs. Black it is made to appear that Scheibel remained in her place of business, in conversation with her, "until about 7:15."

One Elmer Bair makes affidavit that he was in the Black restaurant between 6:30 and 7 and there saw Myers and Scheibel together.

Each of these affiants swears that he, or she, did not disclose the facts within his, or her, knowledge to anyone prior to the conviction of Hamilton; that he, or she, resides in Ismay and will be available at any time the testimony is desired and will testify to the facts set out by affidavit.

The defendant filed his own affidavit in which he swears that none of the evidence set out in the affidavits was known to him at the time of the trial nor came to him until after the trial, although he had "made due search and diligent inquiry as to material evidence available at said trial," and each of his attorneys makes a similar affidavit, to which attorney D. L. O'Hern adds the statement that he had no way of ascertaining that the testimony of any of the affiants would be material in the trial, until after the conviction of Hamilton.

The county attorney filed his affidavit in resistance to the motion in which he shows that Ismay is some seventy-five miles distant from the county seat where the trial was had, with daily train mail, telephone and telegraph service between the two points, and that by the exercise of due diligence the *attendance* of the affiants could have been secured before the defense closed, as the state rested on March 20 but the case was not submitted to the jury until the 23d. He states that Lackner testified to the same effect at a preliminary hearing on December 8,

1928, and that the affiants Smith and Mrs. Jordan testified on the trial of McDonald immediately following that of Hamilton; that both were friendly to Hamilton; and that the husband of Mrs. Jordan, the stock inspector, assisted him in preparing his defense.

The record discloses that the same attorneys represented McDonald as appeared in the trial of Hamilton and that the trial of McDonald resulted in an acquittal. On the trial of McDonald, Dr. J. N. Smith and Mrs. Jordan testified, but it does not appear that the other three affiants did. It may well be that the doubt cast upon the testimony of Scheibel and Lackner by the testimony of Smith and Mrs. Jordan turned the scale in favor of McDonald. The affidavits of Myers, Bair and Mrs. Black cast greater doubt upon the important testimony of Scheibel.

If the facts stated in these affidavits are true, the loading of the horses in question was begun shortly after 6 o'clock and was completed by 7:15 at the latest. At no time during the period of loading was a lantern used. During all of this period the witness Scheibel was, not at the stock-yards, but at the Black restaurant, and the witness Lackner was riding about the city, accompanied by his wife, his granddaughter and Mrs. Jordan. This witness had an opportunity, while so riding, to see the gray horse in front of the Fulton barn, but neither McDonald nor any other person was in sight, nor could the witness have loaned a lantern while the horses were being loaded.

This evidence tends strongly to impeach the testimony of ▮▮ Scheibel and Lackner and would "probably produce a different result upon another trial. * * * 'Where the impeaching evidence may demonstrate perjury in the witness upon whose evidence the verdict was founded and but for which conviction could not have been had,' a new trial should be granted. (*State* v. *Belland*, 59 Mont. 540, 197 Pac. 841)." (*State* v. *Mott*, 72 Mont. 306, 233 Pac. 602, 606; *State* v. *Gangner*, 73 Mont. 187, 235 Pac. 703.)

However, motions for a new trial in criminal cases on the ground of newly discovered evidence are not favored (*State* v. *Van Laningham*, 55 Mont. 17, 173 Pac. 795), and, regardless of the facts set up in the affidavits therefor, the defendant is not entitled to a new trial unless he shows that "he could not, with reasonable diligence, have discovered and produced" the evidence at the trial. (Sec. 12048, Rev. Codes 1921.)

Here the showing is that the defendant and his counsel diligently sought material evidence prior to the trial but had no information as to the new evidence; each of the affiants, in effect, swears that he or she did not impart the facts to any person prior to the trial. True, as stated by the county attorney, by the exercise of due diligence counsel for defendant could have produced the witnesses residing at Ismay, before the close of the case, but how were they to discover the materiality of witnesses who kept their knowledge locked up within their breasts? It is probable that, had inquiry been made of those affiants friendly to the defendant, they would have disclosed their knowledge, and it is not to be presumed that any good citizen would withhold evidence which he knows to be important, but until the damning nature of Scheibel's testimony was disclosed on the trial, no one of the affiants would necessarily have realized that he was in possession of facts which tend to disprove that testimony.

Even as to Mrs. Jordan's statement concerning her association with Lackner, until Lackner's testimony was viewed in the light of that of Scheibel, no importance would be attached to the fact, if it is a fact, that Lackner was riding with Mrs. Jordan until 8 or 8:30 on the night in question. If Lackner testified some months before the trial that he saw McDonald with the gray horse in front of the Fulton barn, Mrs. Jordan should, perhaps, have realized the importance of her testimony on that phase of the case and disclosed her knowledge to the defendant's attorneys, who also represented McDonald, but her

failure to do so is hardly chargeable to defendant or his counsel.

We conclude that the defendant shows due diligence, and that the fact that he could have produced the affiants as witnesses during the trial, had he had any intimation that additional witnesses could be secured, by telephoning or telegraphing to Ismay, seventy-five miles from the county seat, does not militate against that showing. A showing of due diligence does not require that defendant show that he inquired of every person residing at Ismay as to whether or not each knew anything concerning the case.

Newly discovered evidence is made a ground for a motion for a new trial by statute, and, while the courts look with disfavor upon such a motion, when all of the conditions are met, a motion on this ground is entitled to the same consideration as a motion made upon any other statutory ground, and, although a broad discretion is lodged in the trial court in disposing of the motion, a denial is not conclusive. (*State* v. *Gangner,* above.) When such a motion does meet all the requirements of the statute and the above-cited decisions interpreting it, a denial of the motion cannot be upheld without nullifying the statute.

The showing made fulfilled all the requirements mentioned and entitled the defendant to a new trial.

For the reasons stated, the order denying a new trial is reversed, and the cause remanded to the district court of Custer county with direction to grant defendant a new trial.

ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.

MR. CHIEF JUSTICE CALLAWAY, being absent, did not hear the argument and takes no part in the foregoing decision.