STATE, Respondent, v. MILLER, Appellant.

(No. 7,238.)

(Submitted June 29, 1934. Decided July 16, 1934.)

[34 Pac. (2d) 979.]

*Messrs. Ayers & Ayers* and *Mr. Aaron R. Shull,* for Appellant, submitted a brief; *Mr. Shull* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Enor K. Matson,* Assistant Attorney General, for the State, submitted a brief; *Mr. Matson* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Harry Miller, has appealed from a judgment of conviction and from an order denying him a new trial.

The information on which Miller was convicted charged the larceny of a black mare from one Henry J. Behmerwohld of Garfield county. This mare was one of a carload of horses sold and delivered by the defendant at the stockyards in Winnett, to E. W. Vickroy for shipment to Wisconsin. Before permitting the horses to be loaded, the stock inspector de-

manded the production of bills of sale for the horses. Miller stated, in effect, that as a horse buyer he had purchased the horses from time to time with others, and had deposited the bills of sale at other places, but had received no receipts for them. Finally, because of the shortage of feed and water on the range, the inspector passed the lot on what was termed "a blanket bill of sale" from Miller to Vickroy, Miller stating that if the bill of sale was not right he could go to the penitentiary. On complaint of Behmerwohld the mare was returned to Montana, and the prosecution of Miller followed.

On the trial Behmerwohld identified the mare and testified that he had never sold her, but that she belonged to him at the time of the trial. During the progress of the trial it developed that one James Haynie had assisted Miller in bringing in and loading the horses on August 22, 1931, the date of the alleged larceny; during the examination of Behmerwohld the county attorney sought, without success, to have the witness relate a conversation he had had with Haynie at some time after the horses were shipped.

On cross-examination of Edward and Johannes Behmerwohld, sons of the complaining witness, the defendant's counsel developed the facts that the sons could sell or trade horses belonging to their father, and that there was on the Behmerwohld ranch a gray stallion which had at one time belonged to the defendant Miller; and when Haynie was on the stand as the first witness for the defense, counsel sought to prove that the witness had, at some time, traded certain horses to the complaining witness and his son for pasture, it being stated that the offer was made "in anticipation that the state expects to prove or rebut the defense of a claim of title to the mare."

The defense presented is that in 1928 Miller, then and now a horse buyer, had a gray stallion in Haynie's corral which Walter Behmerwohld desired; that he offered to trade it for two horses, and thereupon Walter and Haynie went onto the range and drove in fifteen head of Behmerwohld's horses, from which Miller picked the black mare in question and a black gelding, which animals were thereupon delivered to Miller in

trade for the stallion, which Miller took home and branded with his personal brand.

Miller testified that he turned the two blacks out on the range without having them vented or branding them, as additional brands lowered their value on the market; that he neither received nor gave a bill of sale on the trade, as that was not customary in trading.

Haynie and J. P. Brooks testified that they were present at the time of the alleged trade and heard the conversation between Miller and Walter Behmerwohld. Three witnesses for the defendant testified that they had heard the complaining witness state subsequent to 1928 that he did not own the black mare; that Walter had traded her to Miller.

While Haynie was on the stand the foundation for his impeachment was laid by asking him if he did not have a conversation with the complaining witness, shortly after the horses were shipped, at the latter's house and in the presence of his wife, to which the witness answered in the affirmative. He was then asked if the conversation was not in substance as follows: That he said he wanted to "settle for that horse"; was asked, "What horse?" and said, "We shipped a black mare of yours"; was asked who told him to ship her, and replied, "We had to have her to fill out a carload"; that Behmerwohld then said, "Would you come to the barn and get what you wanted or come to the field and unhitch, and tell me to unhitch?" to which he replied, "Yes, I wouldn't be afraid to do it"; that, accused of stealing the mare, he said he did not steal her, and thereupon Behmerwohld said, "If you didn't steal the mare, Jim, how are you trying to settle for it?" to which the reply was made, "Well, Miller left some money with me to pay for some of these horses"; that Behmerwohld said that neither he nor Miller had enough money to pay for the mare. The witness denied that he had such a conversation.

In rebuttal Behmerwohld and his wife testified that the conversation was had, and the former denied that he had made the statement attributed to him by the three witnesses mentioned above.

Walter Behmerwohld denied that he had traded the black mare to Miller, and testified that he acquired the gray stallion in trade for pasturage when, in 1928, Miller had gathered horses for shipment but which could not be shipped at once; he denied that he ever had any dealings with Haynie for pasture.

The jury returned a verdict of guilty on June 13, 1933. On June 16, 1933, the defendant moved for a new trial on the ground, among others, of newly discovered evidence, supported by three affidavits. One Fred McCormick stated in his affidavit that in March, 1929, Walter Behmerwohld told affiant that he had traded a black mare to Harry Miller for the gray stallion; one Gordon Anderson made affidavit that he was present and heard the conversation. One Fred Garfield made affidavit that in May, 1929, Walter Behmerwohld told him that he (Walter) "had obtained the gray stallion from Harry Miller by trading Harry Miller some other horses." Each of these affidavits closes with: "This affiant further states that no statement as to the conversation hereabove set forth was ever made to the defendant, Harry Miller, or to * * * his attorneys until the fifteenth day of June, 1933, and until subsequent to the trial and verdict."

The first specification of error is that defendant's objection to the question quoted above, as put to Haynie for the purpose of laying the foundation for his impeachment, should have been sustained, and that the court erred in permitting the impeaching question to be answered. It is contended that the question "goes further than mere impeachment of the credibility of the witness Haynie, but contains substantive evidence of the offense itself."

At the time the question as to having the conversation was asked, the objection raised was that it was not shown that the defendant was present, and when counsel explained that he was laying the foundation for the impeachment of the witness, counsel for the defendant again objected that "this defendant cannot be bound by it; it is outside the presence of this defendant." No further objection to the question was interposed,

and it is now contended that impeachment evidence, to be admissible, must be such that the cross-examining party would be entitled to prove it as a part of his case. Authorities to this effect are cited. The cases cited have to do with attempts to impeach a witness on collateral matters, by statements derogatory to the parties calling such witness, but which could not have been proved as a part of the cross-examiner's case. Greenleaf on Evidence (sec. 444), cited, speaks only of the impeachment by the party calling the witness.

It is true that Behmerwohld was not permitted to relate the conversation as a part of his testimony as a state's witness, but had the state been able to lay the foundation for that testimony by proving that the defendant had given Haynie money to pay for the mare and instructed him to do so, the evidence would clearly have been admissible. The question and proof were proper for the purpose of impeaching the witness. (Sec. 10669, Rev. Codes 1921; *State* v. *Spotted Hawk*, 22 Mont. 33, 55 Pac. 1026; *State* v. *Beesskove*, 34 Mont. 41, 85 Pac. 376.)

It is asserted that the court should have instructed the jury ▆ that the testimony above referred to could be considered only for the purpose of impeaching Haynie. Had the defendant desired such an instruction, he should have offered it; a trial court cannot be put in error for failure to instruct the jury on a given point of its own motion. (*State* v. *Francis*, 58 Mont. 659, 194 Pac. 304; *State* v. *Wyman*, 56 Mont. 600, 186 Pac. 1; *State* v. *Brodock*, 53 Mont. 463, 164 Pac. 658.)

The affidavit filed in support of the motion for a new trial contained testimony in corroboration of the defendant's testimony and tending to impeach that of Walter Behmerwohld. The evidence, if produced on the trial, would undoubtedly have strengthened the defense; but, except in so far as it tended to impeach Walter Behmerwohld, it was merely cumulative.

Motions for new trials, on the ground of newly discovered ▆ evidence, are not favored, for the reason that: "The moving party has already had a hearing after ample opportunity to prepare his case, and that, while smarting under defeat and disappointment, he is under strong temptation to

manufacture a plausible showing in support of his motion. * * * It is often the case that the sense of loss arouses him to the diligent activity· which he should have put forth before the trial. By importunity he then interests his friends and through them brings to his support evidence which, if not false, is only cumulative or impeaching. * * * The courts have, therefore, formulated rules within which they hold the particular application must be brought, or it will not avail. They are: * * * (1) That the evidence must. have come to the knowledge of the applicant since the trial; (2) that it was not through want of diligence that it was not discovered earlier; (3) that it is so material that it would probably produce a different result upon another trial; (4) that it is not cumulative merely * * * ; (5) * * * supported by the affidavit of the witness * * * ; and (6) that the evidence must not be such as will only tend to impeach * * * .'' . (State v. Matkins, 45 Mont. 58, 121 Pac. 881, 885; State v. Prouty, 60 Mont. 310, 199 Pac. 281; State v. Hamilton, 87 Mont. 353, 287 Pac. 933.)

Such a motion is addressed to the sound discretion of the trial court (Maki v. Murray Hospital, 91 Mont. 251, 7 Pac. (2d) 228), and where it has denied the motion, the affidavits in support thereof will be closely scrutinized. In the absence of an affidavit showing the facts constituting diligence in seeking to discover the evidence before the trial, the ruling of the trial court will not be disturbed. (State v. Prlja, 57 Mont. 461, 189 Pac. 64; Jenkins v. Kitsen, 62 Mont. 515, 205 Pac. 243; State v. Ingersoll, 88 Mont. 126, 292 Pac. 250.)

It is clear from the synopsis of the evidence that defendant knew in advance what the claim respecting the trade for the gray stallion would be and produced evidence to forestall it. He should have made affidavit of due diligence to secure the additional testimony shown in the affiavits filed in support of his motion. If, in the interest of justice, we should waive the technical objections to the sufficiency of the showing made, still, in the light of the evidence which was before the court and jury on the same subject, we cannot say that the cumula-

tive evidence suggested in the affidavits is "so overwhelmingly convincing as to compel the conclusion that to sustain the verdict would be gross injustice," or that, as impeaching testimony, it "demonstrates perjury," and thus brings the case within an exception to the rules above announced. (*State* v. *Matkins,* supra.)

We cannot say that the trial court manifestly abused its discretion in denying the defendant a new trial.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES STEWART and ANDERSON concur.

MR. JUSTICE ANGSTMAN, being absent, takes no part in the above decision.