STATE of Missouri, Respondent,

v.

James G. EATON Appellant.

No. 45606.

Supreme Court of Missouri,
Division No. 2.

May 13, 1957.

Rehearing Denied June 10, 1957.

Leonard Johnson, St. Joseph, and S. W. James, Jr., Jefferson City, for appellant.

John M. Dalton, Atty. Gen., Aubrey R. Hammett, Jr., Asst. Atty. Gen., for respondent.

LEEDY, Justice.

At the May Term, 1945, of the Circuit Court of Buchanan County, James G. Eaton was convicted of murder in the second degree in having killed Willie Van Ross on February 10, 1945. He was sentenced to imprisonment in the penitentiary for a term of 18 years, which judgment was affirmed June 10, 1946. State v. Eaton, 355 Mo. 164, 195 S.W.2d 457.

About a year after such affirmance—May 28, 1947, to be exact, Eaton, then incarcerated in the penitentiary under the judgment above mentioned, applied to the Circuit Court of Cole County for habeas corpus to effect his release from such custody. In the meantime, Joseph Sherman, the Buchanan County prosecutor, had died (1946). The prisoner's application for habeas corpus was based upon the charge that his conviction resulted: (1) from perjured testimony given by Albert "Cotton" Jones, which perjured testimony was knowingly used by the prosecuting attorney; and (2) from the suppression by said prosecutor of evidence favorable to the accused and corroborative of his defense of self-defense. Those charges were thoroughly explored in an extensive hearing before the Circuit Court of Cole County at which the prisoner was produced, and he and numerous other witnesses, on both sides, testified. That hearing resulted in a finding adverse to the prisoner, and he was remanded to the custody of the warden. Because of the intimate connection or interrelationship between the record and proceedings in that case and the one at bar, it will be necessary to make frequent reference to such former proceeding, and, for brevity, this will sometimes be done by referring to it simply as the habeas corpus case or proceeding without further identifying it. Eaton twice applied in this (the Supreme) court for writs of habeas corpus (1948 and 1951), but his applications were denied for failure to state claims upon which relief could be granted. These two unsuccessful attempts on his part have no bearing whatever on the present appeal except as background material, and will not be hereinafter referred to.

The present proceeding was instituted July 23, 1953, by the filing in the Buchanan Circuit Court of what was captioned as Eaton's "Motion in the Nature of a Writ of Error Coram Nobis." By leave of court this motion was, on September 2, 1954, supplanted by an amended motion bearing the same title, and praying the same relief, i. e., that the judgment and sentence be vacated and set aside, the grounds of which motion were the same as those asserted in the previous Cole County habeas corpus proceeding. The trial court, without hearing evidence, dismissed the motion, as requested by the state, for the reason that a writ of error coram nobis was not a proper remedy. On appeal to this court, it was held that the motion was not to be determined by the name given it, but rather by the facts alleged and the relief sought; that the facts alleged, if proven, deprived defendant of due process of law, rendering his conviction unconstitutional, and that his allegations entitled him to a hearing under 42 V.A.M.S.Supreme Court Rules, Rule 27.26. The judgment was accordingly reversed, and the cause remanded for further proceedings not inconsistent with the opinion. State v. Eaton, Mo., 280 S.W. 2d 63.

On remand, the motion was heard before Judge James S. Rooney, of the 7th Circuit, who had been temporarily transferred for such purpose by order of this court upon notice from the judge who had previously ruled the motion that he had disqualified himself. Such hearing resulted in an order or judgment denying the motion, and refusing to set aside or vacate the judgment, and the present appeal by defendant followed.

The killing in question occurred at a place in St. Joseph called the Harlem Club, located at 211–215 Francis Street, the facilities of which included hotel rooms, a card room, a bar and a restaurant. The proprietors were Albert "Cotton" Jones and

Gus Williams, colored men; defendant and his companion, Harold "Firpo" Simmonds, are white men. Following a period of after-hours drinking and gambling in the place, an altercation arose between these two white men and a Negro, Andrew Hawkins, who had won $40 of their money at cards. As a result of that altercation, Albert "Cotton" Jones induced defendant to take his companion, "Firpo" Simmonds, and leave the premises. They returned a short time later, and the killing ensued, as thus described in the opinion on the appeal in the original case (355 Mo. 164, 165–166, 195 S.W.2d 457–458): "After visiting other places and taking several drinks of whiskey, they went back [to the Harlem Club]. According to the State's evidence, Simmonds said: 'I am looking for that nigger Hawkins * * * him or any other nigger'; and defendant said: 'yes, we came after a nigger'. (Another witness testified that Simmonds said: 'We came to kill him. * * * If we can't find him any nigger will do'; and that defendant said: 'That is right'.) Deceased, a discharged negro veteran still in uniform, was at the tavern bar. He said: 'I can't stand that; you don't want to use them words in here'; and ran over, grabbed Simmonds as he was putting his hand in his pocket, and pinned his arms down by his side. Deceased was facing Simmonds with his back toward defendant who was about eight feet away. (One witness said 15 or 20 feet.) Defendant drew a pistol and shot several times. The first shots went into the wall but two bullets went into deceased's back. The State's witnesses saw no weapon of any kind in deceased's hand and there is no evidence that any was found after he was killed. One witness said that defendant told deceased to turn Simmonds loose and said: 'If you don't turn him loose I am going to shoot you'. * * *

"Defendant's evidence (defendant and Simmonds) was that deceased struck at defendant with a knife; that defendant slid down the bar away from him; that deceased was about to strike again when Simmonds seized his right hand with his left; that Simmonds put his right hand in his pocket to get his knife and deceased grabbed his right hand holding it in his pocket. While they were thus holding each other and Simmonds was yelling and screaming, defendant shot to scare deceased and cause him to let go of Simmonds, but that when he would not do so he shot him. Defendant was crippled and walked with a cane. He said he thought he had no chance if deceased got the best of Simmonds, and 'was scared to death, afraid he was going to cut my head off or something.' Simmonds made a statement to the police on the day of the shooting in which he said he did not know that deceased had a knife and that he did not see anything in his hand. However, at the trial Simmonds explained this statement by saying that he made it while under the influence of liquor and did not know what he said."

The supposed perjury on the part of the witness Albert "Cotton" Jones when testifying for the state at the original trial is charged to have arisen from, and to be comprised of his denial that he saw deceased draw a knife on defendant, or that he saw any knife or weapon in deceased's hands. The suppression of evidence charge grows out of the circumstance that the state failed to call as a witness in its behalf at the original trial one Julia Hollins, an employe of the Harlem Club, who is said to have been present at the time of, and witnessed the homicide. At the time of the hearing before Judge Rooney both Albert "Cotton" Jones and Julia Hollins were deceased, as indeed were not only the trial judge but also Judge Gaddy, one of defendant's attorneys at the original trial and in the habeas corpus case; Bert Lacy, who perished in a hotel fire, and through whom defendant's brother claims to have been enabled to uncover the alleged perjury and suppression of evidence now in question; and, as noted earlier, Joseph Sherman, the prosecuting attorney. The hearing was conducted in an informal

manner, and in many instances without regard to applicable rules of evidence, with the result that much evidence was received which, if objected to, would doubtless have been rejected. Of course, the burden was on defendant at the trial to prove the fact allegations of his motion raising the issues of perjury and suppression of evidence, and as the first step in that direction his counsel offered in evidence (and it was received without objection) the 200-page transcript of the record and proceedings in the Cole County habeas corpus case, which included the testimony of the witnesses together with copies of certain affidavits of Albert "Cotton" Jones and Julia Hollins, and also a copy of the bill of exceptions on the original appeal. It was understood that the trial judge might (and he did) read and consider all of the matters and things contained in said transcript. In other words, the transcript was introduced for all purposes. In addition, witnesses called in his behalf at the hearing were the defendant himself, his brother, his then attorney, and two others who had formerly represented him (one at the original trial and the other in the habeas corpus case) and Gus Williams.

Defendant's attorneys at various times (after the death of the prosecuting attorney) procured a series of affidavits from Albert "Cotton" Jones, three of which are before us as preserved in the record of the habeas corpus case. Their texts run the gamut from discredence of his testimony at the original trial to bald and unabashed admissions of outright perjury committed by him. The first of these affidavits bears date of November 23, 1946, and on May 28, 1947, it was filed with Eaton's application for habeas corpus. After reciting the fact that he was a witness at the original trial, the affidavit (omitting signature and jurat) reads as follows:

"Affiant further states that Joseph A. Sherman, now deceased who was then Prosecuting Attorney of Buchanan County, Missouri, instructed him as to what his testimony must be; that affiant was compelled to so testify in accordance with the said above named official's instructions as the result of the use of high pressure, coercion and threats by the then said Prosecuting Attorney of Buchanan County; that he was a witness for the State and under duress when giving his testimony. Affiant further states that at the above mentioned time, he was interested in the place of business known as the 'Harlem Club' which is located at 215 Francis Street, St. Joseph, Missouri."

Albert "Cotton" Jones did not testify at the *main* habeas corpus hearing (he did on motion for new trial), but the second of his affidavits was introduced at said trial. Dated June 2, 1947, it repeats the recitals of the first one, plus the following:

"I further state that had I not been under duress and given the opportunity, as I observed the altercation and the actions of those involved I would have testified and it is now my opinion that James Eaton was in a position that he was compelled to shoot to protect himself, and did shoot to protect himself, and shot at least twice in the floor to endeavor to stop Willie Van Ross and while in my testimony when I was asked the question, 'Did Willie Van Ross at that time or any other time have any weapon in his hands,' I answered, 'I didn't see any', I am now of the opinion *because of the statement of Bert Lacy and Julia Hollins, who were in a better position to see,* that Willie Van Ross did have a knife." (Emphasis ours.)

The habeas corpus case was determined adversely to the petitioner by judgment entered November 6, 1947. During the pendency of the motion for rehearing therein, and on January 3, 1948, Eaton's attorneys filed in support of such motion still another (the third) affidavit of Albert "Cotton" Jones. This latter affidavit goes the full length, so to speak, with respect both to particularizing the facts and setting up an avoidance of his own calumny, and depones, in substance, as follows: That

through the intimidation, coercion and threats of the prosecuting attorney affiant was compelled to offer and present false and perjured testimony against Eaton; that he informed said prosecutor before the trial that defendant was compelled to shoot Willie Van Ross, the deceased, in self-defense because of the fact that the said Willie Van Ross was approaching the said defendant with a knife at a distance of about four feet, and had before that time attempted to cut the defendant by striking at him with said knife, which said knife was opened and pointed at the defendant; that the prosecutor informed him that he would obtain an injunction against and padlock the Harlem Club, and file an information charging affiant with the commission of the felony of setting up "improper conduct of said place," and that he would cause the sheriff to arrest affiant and place him behind bars; that affiant was then a man past seventy years of age, and the prosecutor knowing it would be impossible for affiant to earn his livelihood in the event such action was taken, he was thus, through intimidation, coercion, duress and threats, compelled to testify that deceased did not have a knife in his hands or in his possession at the time of said shooting; that the prosecutor on other occasions visited the Harlem Club and in the presence of both partners (affiant and Gus Williams) reiterated the above described intimidation, coercion and threats to both of them, that unless affiant testified that the deceased Willie Van Ross did not have a knife in his hands or in his possession, he would see that they both went to jail, and that he would close up their place of business by injunction; that affiant informed said prosecuting attorney that such testimony would be false and would be perjured, but that the prosecuting attorney nevertheless insisted that affiant's testimony must be given in accordance with his, the prosecutor's instructions; that affiant, as a direct result of the above facts, was compelled to present the aforesaid false and perjured evidence.

This affidavit was accompanied by one made by Gus Williams, in which Williams stated he was present on the occasions mentioned in the foregoing affidavit of Albert "Cotton" Jones, and that he heard what transpired between Jones and the prosecuting attorney. The affidavit then states by way of conclusion, that the prosecuting attorney knew that the testimony so to be given by Jones was false and perjured.

Both affiants, Jones and Williams, testified on the motion for rehearing in the habeas corpus case, the transcript of which is before us, from which it appears that the testimony of each represents, in substance and effect, a composite of their several affidavits. Their examinations were marked by contradictory and confusing answers in reply to highly leading and suggestive questions.

Gus Williams, when testifying before Judge Rooney, was a reluctant and uncertain witness. His memory was not at all good, and he would not undertake to recall what had transpired between himself and Jones, on the one hand, and the prosecutor, on the other, nor to what he had testified at the habeas corpus hearing. Instead, he was willing to stand on the latter testimony —whatever it may have been—because the facts were then fresher in his mind. But he did state that for several years before his death, Albert "Cotton" Jones had become so senile as to be incapacitated. As the perjury aspect of the case turns on "Cotton's" veracity and the credence to be given his declarations, we deem it unnecessary to burden this opinion by stating the effect of other evidence produced by defendant which is not relevant to this question.

The state introduced as a witness Francis J. Holley, a state probation and parole officer, who in 1948 made an investigation of Eaton's case at the request of the Governor of Missouri. In the course of that investigation he interviewed Albert "Cot-

ton" Jones on October 14, 1948. The interview, in question and answer form, was reduced to writing and subscribed and sworn to by Jones. The state offered the transcript thereof, identified as Exhibit 1, to which defendant's counsel stated there was no objection. The exhibit is too lengthy to reproduce here, and it is difficult to state its substance and effect because the answers of Jones are inconsistent and confusing. It is enough to say that he stated he had looked at his affidavit prepared by defendant's counsel, but couldn't understand it— "there was so many things in there, I just made the statement the best I could." Further on, he disclaimed any knowledge of having admitted in the affidavit that he had committed perjury at the original trial. He readily admitted having made an affidavit in the office of the prosecuting attorney on July 31, 1947, which was contradictory of the affidavits he had made in defendant's behalf, a copy of which subsequent affidavit (State's Exhibit 2) was produced and by him identified. The interview concluded with his declaration that he would stand on both of his statements, that is, those given to the defendant and the subsequent conflicting one given the prosecutor.

At the original trial the state did not rely solely on the testimony of Albert "Cotton" Jones to prove that Van Ross had no knife. The state's other eyewitness, Ted Strother, testified directly to such fact, and corroborated Jones on that and other points. Strother did not see any knife or weapon in the hands of Van Ross, and there has been no retraction of his testimony.

The record further shows that a newspaper reporter, a then assistant prosecuting attorney and another individual went to the scene of the shooting within a matter of minutes after it happened, the newspaper having relayed word to its reporter at the court house. When these persons arrived at the Harlem Club, the dead body of Willie Van Ross was lying on the floor. There were seven or eight colored people standing around, including "Cornbread" Gordon,

"Cotton" Jones, Ted Strother and Julia Hollins. It further appears that Newcomer, the assistant prosecutor, at once began asking questions of all those present as to the facts in relation to the killing, and he ascertained that it had been done by Eaton, but there was no mention by any of them that deceased had a knife or had been wielding it, nor was any knife or other weapon found on his person or elsewhere. Moreover, Mr. Goff, one of defendant's attorneys at the original trial, testified that he knew Albert "Cotton" Jones and saw him on the street "pretty often" before the trial; that he knew "Cotton" was present at the shooting, but he did not talk to him about it "in particular;" that about the most that "Cotton" had said to him was that "it was the rumor, concensus of opinion that this colored boy [Van Ross] was out of line * * * was at fault; that Jimmy [Eaton] was perfectly innocent." The witness then made this significant admission:

"Q. Did 'Cotton' Jones at any time before the trial tell you that he saw a knife in this—in Willie Van Ross' hand? A. Yes, sir.

"Q. 'Cotton' Jones told you that? A. Yeah."

Notwithstanding this knowledge on the part of defendant's trial counsel, there was no explanation of why he failed to cross-examine "Cotton" on the subject.

 Complaint is made of the failure of the court to make findings of fact and conclusions of law as provided by Rule 27.-26. About ten days in advance of the trial, Judge Rooney had suggested to counsel on both sides that any desired findings of fact and declarations of law be prepared and submitted for the court's consideration, but this was not done. At the close of all the evidence, the court offered to consider any such findings and declarations as might then or within ten days thereafter be tendered. One of defendant's attorneys stated that he believed it was the function of the attorneys to formulate and submit such findings and

declarations, and he understood and agreed that until they (defendant's counsel) determined whether they would do that, the court would not itself make such findings and declarations. In this situation, we think the defendant may not complain, and the fact issues will therefore be deemed to have been found in accordance with the result reached. Review of the matter is de novo under Rule 28.05, which means on the record as made in the lower court, as in suits of an equitable nature, and not a trial de novo in the sense of a complete retrial at which new proofs may be made and the whole case opened up.

 We need not examine into the assignment that the court erred in admitting the transcript of the interview between "Cotton" and the probation officer, this for the reason that defendant interposed no objection to the introduction of said exhibit. State's Exhibit 2, the affidavit of "Cotton" made July 31, 1947, at the office of O. R. Newcomer, then prosecuting attorney, was shown to have been a copy of his original affidavit, which original was accounted for as having been lost. Defendant's objection based on the want of such showing was therefore properly overruled. The further objection that there was no foundation laid for the reception of the affidavit as impeachment is not tenable. The affiant, "Cotton", was then deceased, and the fact that at the earlier habeas corpus hearing the state did not interrogate him concerning such affidavit would not, contrary to defendant's position, render it inadmissible at the subsequent hearing on the motion to vacate. For like reasons, the same ruling applies to State's Exhibit 3, the affidavit of Julia Hollins given the prosecutor's office on July 31, 1947.

 So far as the perjury charge is concerned, it is manifest from such of the facts as have been stated that the court did not err in rendering judgment against defendant. The utter improbability of the prosecutor (who is now deceased and cannot speak for himself) undertaking, by threats of reprisal, to obtain false testimony to be used by the state; the canniness with which it was sought to make it appear that the prosecutor was always alone, and not assisted by any member of his staff, when investigating the case and in interviewing "Cotton" and Gus; the admission of defendant's counsel that "Cotton" had told him prior to the trial that Van Ross had a knife, and his (counsel's) failure to cross-examine "Cotton" on that subject; "Cotton's" conflicting statements and his then advanced age and senile condition, and the lack of memory on the part of Gus are only a few of the many circumstances which militate against the bona fides of defendant's present claim. Paradoxically, defendant's proof of perjury lacks the ring of truth. "Cotton" appeared in person and testified before the judge who heard the habeas corpus case, and that judge did not credit his story; Judge Rooney, who heard it again on the cold record, just as we are presently doing, did not believe it, nor do we.

It will be recalled that the suppression of evidence charge arises out of the failure to call as a witness at the original trial one Julia Hollins, an employe of the Harlem Club. She was endorsed as a witness on the information under the name of Julia Holland, but this error in spelling is wholly without significance. Julia was present at the trial (and this fact was known to defendant's counsel at the time), but she was not called as a witness. After the death of the prosecutor, Julia signed an affidavit prepared by defendant's counsel in which she stated that she was present at the time of the shooting, and that she observed that Van Ross had a knife in his hand with the blade open and protruding as he advanced threateningly toward Eaton, and that she had discussed with Mr. Sherman the matter of her testimony, and had informed him it would be as above stated; that neither defendant nor his counsel were at any time informed as to what her testimony would be. Her later affidavit made July 31, 1947, at the office of the prosecuting attorney,

makes the following, among other, recitals: "I saw the knife first when he pulled it on Firpo in the bar room. I was afraid and didn't want anything to do with it. * * I was so frightened at the time. * * * This is the first time I have told anyone about seeing the knife, except the statement I made to Waldo Goff. * * * No one knew about me seeing the shooting, and neither did the defense attorney know that I saw it until this was all over. I was not threatened in any way not to tell * * *." She testified at the subsequent hearing on the motion for new trial in the habeas corpus case (January 10, 1948) that she saw the knife in the hands of Van Ross; that that was discussed "down there" (at the Harlem Club) a time or two before the case was tried, and she told Mr. Sherman that her testimony would be that she did see the knife in Van Ross' hands. But on cross-examination the witness testified as follows:

"Q. Did you have any conversation with Mr. Sherman or Mr. Newcomer the morning after this crime occurred? A. Yes, sir.

"Q. Did you have any other conversation with him, and did you tell them at that time that you had seen the knife in the hands of Van Ross? A. No, sir.

"Q. You knew at that time that you thought you saw a knife? A. I knew I had seen the knife.

"Q. Did he ask you about any weapons? A. No, sir. I went back upstairs. I didn't stay there very long.

"Q. Did you have any reason for not telling him about the knife? A. No, I didn't have any reason, other than I didn't want to be bothered or mixed up in it."

Mr. Newcomer specifically denied that he had any knowledge that Julia Hollins saw, or claimed to have seen the knife referred to in her affidavit and subsequent testimony.

He testified that on the morning of the shooting, when he was at the Harlem Club interrogating prospective witnesses, Julia was there, and he asked her about the knife and "she didn't know anything about it at all."

■ Missouri does not follow the rule embodied in the charge of a Pennsylvania trial judge (quoted in United States ex rel. Almeida v. Baldi, 3 Cir., 195 F.2d 815, 819, 33 A.L.R.2d 1407, 1414, but not, as we understand, as actually declaratory of the law of Pennsylvania) which is strongly relied on by defendant, as follows: "The District Attorney has the obligation, no matter if it seems to be repetition, to call every witness who knows anything about it, whether that witness favors the Commonwealth's case or is against it, * * *." Our own cases are quite to the contrary. "It has been the uniform ruling of this court that the state is under no obligation to place any given person on the witness stand, and, consequently, the motion of defendant to compel the state to call and examine English [a policeman who was present at the time and place of the murder there in question] as a witness was properly denied." State v. McAfee, 148 Mo. 370, 379, 50 S.W. 82, 84. The case of State v. Dixon, Mo., 190 S.W. 290, further demonstrates the inapplicability of the supposed Pennsylvania rule which defendant would have us adopt. It was a murder case in which all of the witnesses and principals were colored persons. There was a gathering at the home of defendant where those assembled engaged in drinking diluted alcohol and sugar and shooting craps. The defendant had been winning until deceased became offended and quit the game. Defendant and deceased then quarreled and an altercation followed, which shortly thereafter resulted in the defendant shooting and killing the deceased, and on the point with which we are now concerned the court stated as follows:

"Much complaint is made of the fact that the state did not put one Richard or "Pid-

dle" Moore on the stand as a witness. This potential witness was, it is to be inferred from the record, present in the courtroom in obedience to a subpoena issued by the state. The force of defendant's contention is difficult to appreciate. It is apparently his theory, however, that Moore, who watched the body of deceased, took a pistol therefrom, and that if Moore had been put on the witness stand by the state an opportunity to cross-examine him as to this fact would have been afforded to defendant, and if the witness had denied the fact an opportunity to impeach him would have been afforded.

"The record nowhere discloses any bias, or any reason for bias in the attitude of this negro Moore. He was in attendance at the trial, and though subpoenaed for the state, no reason is shown, or to be conceived why, if his testimony was of value to the defense—i. e., if he in fact had taken a pistol off the body of deceased—defendant could not himself have called him as a witness and elicited such fact from him. * * Turning to the other phase, we cannot of course upon the facts here bottom error upon the failure of the state to call a witness merely in order that the defense may have an opportunity to impeach such witness. The proposition is wholly untenable, and needs only to be stated in order for this to be apparent."

 Of course, these holdings are of necessity subject to the qualification that prosecuting officials, in appraising available testimony and in the exercise of their discretion as to whom to believe or disbelieve, are not at liberty to act in a way that is fundamentally unfair to the defendant, and in no event is the deliberate suppression of evidence vital to an accused's defense to be sanctioned, this latter being the effect of the holding on the former appeal in this case. Here the name of the witness is endorsed on the information. Her address is known. Defendant, through his counsel, makes no effort to ascertain what knowledge she has concerning the facts. She appears at the trial, and the state does not put her on the stand, and even then defendant makes no effort to interview her, or to learn what facts are within her knowledge, and does not put her on the stand. Defendant may not thus sit idly by, and then, years later, on motion to vacate, attribute to the state a deliberate purpose to suppress evidence. Under the facts of this record, we are not confronted wtih the deliberate suppression of evidence, nor, for aught that appears, any unfairness toward defendant in that regard. The judgment denying the motion to vacate and set aside should be, and it is, affirmed.

All concur.