STATE of Missouri, Respondent,

v.

Douglas Wayne THOMPSON, Appellant,

No. 51140.

Supreme Court of Missouri,
En Banc.

Dec. 13, 1965.

Norman H. Anderson, Atty. Gen., Jefferson City, Bill D. Burlison, Sp. Asst. Atty. Gen., Cape Girardeau, Howard L. McFadden, Asst. Atty. Gen., Jefferson City, for respondent.

James B. Herd, St. Louis, for appellant.

EAGER, Judge.

This defendant was convicted in December, 1961, of first degree murder and, upon a finding making our Second Offender Act applicable, he was sentenced by the court to be executed. At the trial he was represented by counsel of his own choice. Upon appeal, the judgment and sentence were affirmed. 363 S.W.2d 711. Generally, the points involved upon the appeal did not include those which confront us now. The crime of which defendant was convicted occurred in Cape Girardeau County; he was tried in Bollinger County on a change of venue. The essential facts are stated in our former opinion. By sundry intermediate proceedings the execution of the sentence has been stayed.

On January 13, 1964, defendant filed in the trial court, acting through new counsel, his motion to vacate the judgment under

our Rule 27.26, V.A.M.R. The court denied the motion without a hearing, from an examination of the files and record. On appeal this court, acting on its own motion, reversed the judgment and order and remanded the cause for a hearing upon specifically designated questions of fact raised in the motion. Upon disqualification of the regular judge, the Honorable Marshall Craig was designated to hear the matter. He has done so in a lengthy and meticulously conducted hearing, has entered his findings, and has denied the motion. The matter is now here for a determination de novo on the merits upon the voluminous evidence presented.

We first digest, very briefly, the allegations of the motion, as amended. They are: (1) that the conviction was obtained through the willful use of perjured testimony on the part of Police Officers Robert Ross and Hugo Lang; (2) that the conviction was also rendered void,—(a) by the use in evidence of written and oral statements which were involuntarily made; (b) because defendant was denied effective assistance of trial counsel in that the latter did not require a showing of voluntariness before permitting the statements of defendant to be received in evidence; (c) because the Prosecutor deliberately suppressed material evidence, namely, empty shells found at the scene of the shooting and a ballistic report concerning them, and also misled the jury in argument into believing that no such evidence was in the State's possession; (d) in that defendant was denied a voir dire examination sufficient to determine the prejudices of the members of the jury panel, in view of the widespread publicity and the existing sentiment against him. The transcript proper consists of 466 pages; in addition, we have the transcripts of the original trial and of the coroner's inquest (offered as exhibits), a supplemental transcript of additional parts of the trial proceedings, and scores of other exhibits. Although defendant was granted leave to appeal as a poor person with a free transcript furnished, we note

that he was represented at the hearing and is now represented on this appeal by non-appointed counsel, and that his seventy-two page brief has been printed, which represents no inconsiderable expense. He certainly does not come here entirely as an indigent in the usual sense.

The trial court found: that there was no use of perjured testimony; that the statements made by defendant and introduced at the trial, both oral and written, were voluntary; that the voir dire examination was sufficient; that defendant was not denied the effective assistance of counsel; and that the movant failed to show that the Prosecutor had suppressed material evidence. In certain of these findings the court indicated its reasoning more particularly; we shall refer to some of these findings further in the body of this opinion.

As stated, the facts are rather fully set out at 363 S.W.2d 711. On the evening of March 10, 1961, two police cars had been pursuing a 1956 Oldsmobile driven by Sammy Aire Tucker with the defendant riding as a passenger, in the north part of Cape Girardeau; they stopped it on the shoulder. One police car stopped a few feet behind the Oldsmobile, the other turned around and stopped on the opposite shoulder. From the first car Officer Crittendon walked up beside the driver and began to question him, Officer Goss walked to a position opposite the rear window on the right side. Tucker, without warning, shot Officer Crittendon fatally in the stomach, and immediately began firing at the officers across the road; at almost the same instant shots were heard on the right side of the Oldsmobile, resulting in the death of Officer Goss whose gun was still in its holster. One shot went through both of his legs near the knees, severing arteries in both legs, and he died that evening from loss of blood. The present defendant was standing beside the passenger's seat of the Oldsmobile at the time. Another officer, Lang, was somewhat to the rear. As indicated in our former opinion, there was ample evidence to support

the conviction of this defendant for the murder of Officer Goss.

It is generally both difficult and disagreeable for a court to "rehash" the events of a criminal trial and conviction after such a lapse of time, particularly in collateral proceedings, as here. And, certainly, the prolonging of such proceedings over a period of years usually works no good, either to our processes of justice, or to the regard in which those processes are held in the minds of the lay public or the Bar. Yet, so long as this mode of review is permissible, it is our solemn duty to consider and enforce it. In this background we have given this record a somewhat unusual amount of study.

 We agree with the findings of the trial judge in all particulars but one. That, of course, proves vital. This point of disagreement is expressed in defendant's brief in part as follows: " * * * that the prosecutor at the appellant's trial deliberately suppressed and failed to disclose to the court or defense counsel material ballistic evidence in the possession of the state consisting of cartridge cases found at the scene of the shooting and in the appellant's automobile." In the argument which follows counsel emphasizes the misleading effect of the Prosecutor's oral arguments to the jury. Various courts have held that the suppression of (or failure to disclose) evidence in the possession or control of the prosecution which is favorable to defendant and which might be persuasive to a jury, constitutes such a fundamental unfairness as to invalidate a conviction because violative of due process. Ashley v. State of Texas (CA5), 319 F.2d 80 (withholding of report of doctors that defendant was incompetent); United States ex rel. Thompson v. Dye (CA3), 221 F.2d 763 (withholding testimony tending to show that defendant was in such condition because of alcohol or drugs or both, as to be incapable of entertaining a specific intent or of deliberation); United States ex rel. Almeida v. Baldi (CA3), 195

F.2d 815, 33 A.L.R.2d 1407 (withholding of recovered bullets after murder in a store holdup); Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (withholding part of the true knowledge of a prosecution witness which might have directly affected the penalty); United States ex rel. Meers v. Wilkins (CA2), 326 F.2d 135 (withholding evidence that certain witnesses had been unable to identify defendant); Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (where the evidence withheld had been requested by defendant, but the court expressly adopted the rule stated in the Dye and Baldi cases, supra); and see generally, United States ex rel. Butler v. Maroney (CA3), 319 F.2d 622; Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; State v. Belland, 59 Mont. 540, 197 P. 841. Wilkins, supra, rules expressly that a request for the disclosure is not a "sine qua non to establish a duty on the prosecution's part." These cases recognize that the principle is applicable where the suppressed evidence bears on the penalty which the jury would impose, even though the defendant, if convicted, would be guilty of first degree murder on the felony-murder doctrine. That particular feature is not in point here because the case was not submitted to the jury on the felony-murder doctrine but on the direct issue as to whether defendant shot and killed Officer Goss. The jury was charged to determine his guilt on that submission, either as first or second degree murder. Hence, any misleading of the jury here would affect the issue of guilt or innocence, if it had any effect at all, and the court ultimately fixed the penalty.

 It has also been recognized that the suppression of evidence is exaggerated where the prosecution misleads the jury by some affirmative statement touching the subject. United States ex rel. Thompson v. Dye, supra; there the court said, 221 F.2d loc. cit. 769: "Here the prosecutor not only kept quiet about the existence of such testimony, but, as Judge McLaugh-

lin points out, even stated in open court that other police officers if called 'would corroborate what already has been testified to.' Thus, the wrong of nondisclosure of obviously significant testimony was compounded by a misleading affirmative statement as to the nature of the available but unused testimony." The subject is discussed in detail in articles appearing at 60 Columbia Law Review 858, and in 74 Yale Law Journal 136. In the latter it is indicated that the motive of the prosecutor is now not so material an element as is the disadvantage worked on the defendant (Dye-Brady, supra). We do not express entire approval of all conclusions of that author. Missouri has fully recognized that the knowing use of false testimony invalidates a conviction. State v. Eaton, Mo., 280 S.W.2d 63; State v. Eaton, Mo., 302 S.W.2d 866; State v. Statler, Mo., 383 S.W.2d 534. And in Statler, we held further that "This phase of the rule requires a prosecutor who knows *at the trial* that material false testimony has come in on behalf of the State to correct it then and there." So far as we have found, we have not been required to rule specifically upon a withholding or suppression of evidence.

We review briefly the evidence affecting this question. The defendant testified at the trial: that he did not fire any shots (at all) on the occasion in question, and that he did not know that Tucker was going to shoot; that his gun, a Browning semiautomatic pistol, was in his waistband and remained there as he stood on the right side of the car with his hands raised; also, that his gun had no shell in the barrel (chamber). Both the Browning and a German Walther semi-automatic (which he said Tucker had) shot nine millimeter shells and ejected each shell when it was fired. The police revolvers did not eject expended shells. Defense counsel asked Officer Shannon Kelley if he had found any expended shells at the scene; he answered that he had looked but that he had not found any, and that he did not know

whether anyone else had. In rebuttal Kelley testified that two holes were found in the roof of the Oldsmobile (just above the rear window) where bullets from the inside had passed through; that, by lining these up with a pencil, they pointed to the passenger's side of the car. On the hearing of this motion it was shown that the officers (Cape Girardeau police or Highway Patrolmen or both) had recovered five nine-millimeter shell casings from the abandoned Oldsmobile, and that three similar shells were brought to the police by Ezra Crittendon, father of one slain officer, on the day after the shooting. A written police notation (received in evidence and obviously a part of the police files) stated that two of these three were picked up at the scene on the east side of the highway and one on the west side; that a Mr. Overall, in Mr. Crittendon's presence, picked up the shells and gave them to him. These eight shells, with the sundry guns, ammunition, etc., were immediately forwarded to the laboratory of the State Highway Patrol; they were examined there in detail, and a report sent to the Cape Girardeau police. So far as we are concerned here, the material portion of this report stated that the three shells found in the road (as well as the other five) were all fired in the P–38 (Walther) semi-automatic pistol. This report was dated April 26, 1961. On June 2, 1961, the Chief of Police wrote the Highway Patrol Laboratory that he wished to have all the guns returned, but that "It is our belief now that expert testimony from the laboratory will not be used in this trial." Some further explanation was made. The guns were produced at the trial, but no shell casings were produced and the report was not produced. In our prior opinion we noted that no "spent shells" were found.

The non-production of shell casings was argued by counsel at length and in detail at the conclusion of the trial, this obviously having become an issue. We quote as follows from the opening argument of the Prosecuting Attorney: "Mr. Kearby un-

doubtedly is going to harp about the fact that if there was a shot there must have been a shell casing. Well, I don't know why there wasn't a casing found. I suppose for the same reason that there weren't any casings found from Tucker's gun. Everybody runs out to the scene of the murder. Those shells are probably on some small boy's shelf in a room, he is proud of them. That's where they are. Maybe they are in the car, I don't know. You'll note that the gun ejected to the right. Maybe that's where they are. I don't know. But, wherever they are, they are at the same place that the shells from Sammy Tucker's gun are. There weren't any of those found either."

Mr. Kearby (defense counsel) did argue that "They didn't get any of those bullets, they didn't get any spent shells * * *. Thompson said the shells were ejected. If he shot on the ground, the shells would have been on the ground, wouldn't they? * * * Then you ask yourself this question—where did those spent shells out of the automatic go? Why didn't the officers take the bullets out of the car and have a ballistics expert from the Highway Patrol test them and see what gun they came from? * * * why didn't they bring in these shells from this automatic, bring them in and show them to the jury? Why didn't they bring those in? You are trying him on this case?" In concluding, the Prosecutor argued further: "Now, Mr. Kearby has, as I expected, had much to say because no shells were found. * * * You are not to decide this case upon what evidence might have been presented or what wasn't presented. You must decide this case upon the evidence that was presented and if you find that the evidence is that Douglas Wayne Thompson shot Herbert Goss, the fact that there was or was not a shell presented is unimportant. You know perhaps as well as I do, I don't know why the shells weren't here. * * * Now, gentlemen, we have brought in all the evidence we have."

At the hearing on the present motion, the trial Prosecutor testified that he had re-ceived and examined "a report" relating to some laboratory tests; that he had examined the police reports and that he knew the police had some shell casings that "other people said had been found out there"; that he would "guess" that the finding of shell casings would be a material circumstance. Generally, his testimony was very vague. It requires no great imagination to realize that the Prosecutor did, in a case of this notoriety, keep himself abreast of all such developments.

■■■ If we had here the mere failure of the prosecution to produce the shell casings and the ballistic report, we would have a materially different question. As stated in Dye, supra: "It seems likely that many situations will arise in which a prosecutor can fairly keep to himself his knowledge of available testimony which he views as mistaken or false." Arguments could be made here to justify a mere non-production, such as—that the state was not bound by defendant's testimony as to which gun he had, that defendant's counsel should have attempted discovery by some available means (though criminal discovery in Missouri is rather limited), and that there was ample evidence in the record to convict defendant of the murder of Officer Goss. We do not rule this point on mere non-production. The situation was grossly exaggerated by the argument of the Prosecutor. Note here the similarity of our facts with those in United States ex rel. Almeida v. Baldi (CA 3), 195 F.2d 815, 818. We do not attribute any bad faith to the Prosecutor, nor do we need to do so; his statements were obviously made in the heat of the argument. But the statement, made in words or substance, that no shells were found, materially misled the jury. The fact, if shown, that *all* of the empty shells found on the ground and in the car had come from the Walther pistol, would have been substantially more corroboratory of defendant's theory and testimony than was the mere failure to produce *any* shells. We hold that the non-production *and* the argument placed defendant in a constitutionally unfair position; for this

reason, *only*, the judgment and sentence must be vacated.

■ Defendant has had a full hearing on the other points raised in his motion. In so far as they might conceivably be involved at another trial, whether in like form or in principle, we shall rule upon them. A final adjudication of such points forecloses their use in the future. State v. Shell, Mo., 299 S.W.2d 465, certiorari denied Shell v. State, 353 U.S. 967, 77 S. Ct. 1052, 1 L.Ed.2d 916, certiorari denied 356 U.S. 939, 78 S.Ct. 782, 2 L.Ed.2d 814; State v. Kitchin, Mo., 300 S.W.2d 420, certiorari denied Kitchin v. State of Missouri, 354 U.S. 914, 77 S.Ct. 1299, 1 L.Ed.2d 1429; State v. Moreland, Mo., 396 S.W.2d 589, opinion filed November 8, 1965. We do not propose to leave any unnecessary "loose ends" in this matter which might prolong it further.

■ The first of such points is that the State used false and perjured testimony. Conceivably, a similar claim might arise from another trial. This contention is based upon the testimony of Officers Ross and Lang, counsel contending that their testimony at the trial was obviously false when compared with their testimony at the coroner's inquest and with written statements given shortly after the affray and offered as exhibits. Officer Ross (in the police car just across the road) testified: that at the time Tucker shot from the driver's side of the car, the man standing on the right side of the Oldsmobile pulled a gun from his waistband, "brought his arm up and there were two shots," and he saw a flash on that side; that as the man whirled, the seat of the car prevented him from seeing the man's hand; that Officer Goss (who had been facing the car) turned toward the man and yelled, "I'm shot," then again turned as if to get away, and fell; that Officer Lang had been back of the car but had "made a run" to get out of the light. At the coroner's inquest Ross, in a narrative manner, had testified that a man appeared on the right side of the car (whom he could see from the waist up) as the doors opened, and he heard shots on that side; that Goss said, "I am hit"; that he (Ross) then got down. In a written statement Ross had stated: that as Tucker shot Crittendon, the other man appeared on the right side of the Oldsmobile, and turned facing Goss; that his hand was concealed by the car but his right arm was pointing toward Goss, that he (Ross) heard two shots immediately after Crittendon was shot, heard Goss cry out and saw him fall. Such differences as may have existed between Ross' trial testimony and his previous statements were at most mere inconsistencies, but generally they constituted a simple elaboration of his previously stated observations. The same is true of the testimony of Officer Lang. The supposed differences there concern the exact place where Lang was when the shooting started, and whether he was standing erect or either partially or wholly crouched down when he fired at the defendant. At the trial he testified that he had looked in the back of the Oldsmobile with a flashlight, that when the two men got out of it he was "coming around between the two cars," that he heard shots, took a position on the right side of the patrol car and fired at the man standing on the right side of the Oldsmobile; that he then ducked across the highway; that he did not actually see defendant shoot; that so far as he recalled he was upright when he fired, later saying that he was positive of this. At the coroner's inquest he had testified that he had looked in the back of the Oldsmobile, that he then came around between the cars to the right side of the patrol car, that the passenger (defendant) came out of the Oldsmobile and stood two or three feet from it and shots were fired, and "I went down" and got off two shots at that man on the right side of the Oldsmobile; that he then ducked behind the patrol car and crossed the road. Lang's written statement was to the effect that he passed between the cars, that the passenger got out of the Oldsmobile, and he heard shots; that he fired two shots at that man, that (somewhere in that period)

he "crouched down" at the side of the patrol car, and that he then crossed the road. At the hearing on the present motion Lang testified that he could not be certain of his exact location when he first heard the shots; that he fired at defendant as he (Lang) was in the process of crouching down; that the space between him and the defendant was clear when he shot; that no one had told him what to say in his testimony, and that in every instance he had told his story as he remembered it. Counsel argue the concealment at the trial of Lang's supposed crouching position as important because, they say, Goss may have been shot at or near the knees by Lang. It is obvious that in such a confused and confusing situation the precise spot where one was standing at a given moment, and even his precise position, might well be a matter of uncertainty; the supposed conflict certainly did not rise to the status of knowingly false testimony. Counsel argue also that the divergencies in the testimony of these two witnesses were emphasized and exaggerated by the argument of the Prosecutor. What we have said covers that question fully; the argument was within the evidence and the fair inferences therefrom and did not constitute a misleading of the jury. One basic misapprehension of counsel is his apparent opinion that a man standing erect (as defendant was) could not shoot a person at or near the knees, with the bullet's course "slightly downward"; that all depends on the angle at which the person firing holds the pistol, and the level from which he fires it; there was evidence that defendant's hand was below the top of the car seat when the first shots on that side were fired. The medical testimony showed that Officer Goss was shot from the right side, and the *only* person on his right, as he faced the car, was the defendant. The conviction was not obtained by the use of false or perjured testimony. We have considered all the cases cited by defendant and recognize the rules stated but, on their facts, they are inapplicable here.

We shall consider very briefly defendant's contention concerning the admission of his oral and written statements. Counsel may seek to raise the question at another trial. Defendant's evidence at this hearing of the supposed involuntary nature of the written statement, though not impressive, would have been sufficient to make a fact issue at the trial had it then been so given. It is extremely doubtful, to say the least, if the same is true of his oral statement made to Patrolman Crow. Although defendant testified at the trial, neither he nor his counsel made any claim whatever that the statements were involuntary and they undoubtedly proceeded on the theory that they were voluntary and that in some respects they were helpful to the defense. When the written statement was first identified, the Prosecutor tendered it to defendant's counsel and suggested that the matter might require evidence "to the court," thus essentially inviting a hearing; the court then took a recess. In other words, defendant and his counsel made a voluntary and studied election. Our cases of State v. Goacher, Mo., 376 S.W.2d 97; State v. Williams, Mo., 369 S.W.2d 408, and State v. Phillips, Mo., 324 S.W.2d 693, cited by defendant, fully recognize the principle that a confession induced by coercion is invalid (as do also the federal cases, some of which are cited), but they are wholly inapplicable to a situation such as this. We see no point in reviewing here defendant's lengthy testimony concerning his interrogation, his hardships while fleeing from the law, and his supposed abuse when first arrested, all as given at the hearing on the present motion. It tends to leave the impression that it was developed largely as an afterthought. The trial court heard and considered this on the merits and also other testimony which was to some extent corroboratory. It also heard the evidence to the contrary. The defendant has now had the factual hearing which we held that he was entitled to. The trial court has found that the statements were voluntarily made, after hearing all the evidence; giving def-

erence to that court on the matter of credibility, we agree and so find.

■ The foregoing point more or less merges into the contention that defendant was denied the effective assistance of counsel in that his counsel failed to require a determination of the voluntary or involuntary nature of the statements. Actually, neither the oral nor the written statement constituted a confession, for neither contained an admission of the *crime* charged. 31A C.J.S. Evidence § 270, p. 696. They were introduced as admissions against interest. Defendant did not admit in either statement that he had fired a shot on the occasion in question. Counsel (and defendant) apparently determined as a matter of trial strategy that the statements were as likely, or more likely, to be helpful than harmful. These are matters normally within the realm of counsel's judgment and do not constitute acts of ineffectiveness entitling defendant to relief under Rule 27.26. It is hardly possible that this matter will arise again in any similar form, but we agree entirely with the detailed finding of the trial court that defendant was not thus denied the effective assistance of counsel. See generally: State v. Turner, Mo., 353 S.W.2d 602, 605; State v. Warren, Mo., 321 S.W.2d 705, 709; Mitchell v. United States, 104 U.S.App.D.C. 57, 259 F.2d 787, 789; Sheridan v. United States (CA 5), 264 F.2d 236; State v. Childers, Mo., 328 S.W.2d 43; State v. Rutledge, Mo., 317 S.W.2d 365. We have said in the past that proceedings under Rule 27.26 are not to be used or considered as a second motion for new trial or a second appeal. Childers, supra. The cases cited by defendant concerning the deprivation of the effective assistance of counsel, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Mitchell v. United States, 104 U.S.App.D.C. 57, 259 F.2d 787; Jones v. Huff, 80 U.S. App.D.C. 254, 152 F.2d 14; Brubaker v. Dickson (CA 9), 310 F.2d 30; Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, and State v. Thompson, Mo., 363 S.W.2d 711, differ so upon their facts that we do not consider them further.

■ We shall spend no time or space upon defendant's last contention, namely, that he was denied a voir dire examination sufficient to determine the prejudices of the members of the jury panel. The contention has been urged because of the wide publicity given to the matter in newspapers, radio and television. At another trial defendant's counsel may conduct such further examination as he chooses. The trial court here leaned over backwards to excuse every venireman who thought that he was or might have been prejudiced by what he had heard or read. Section 546.150, RSMo 1959, V.A.M.S., applies directly to this situation, and the trial court has much discretion in deciding whether any opinion founded on "rumor and newspaper reports" is such as to "prejudice or bias the mind of the juror."

We have perhaps unduly lengthened this opinion with a discussion of points which may not arise at another trial. In an abundance of caution, this has been done in the hope of terminating this cause at some early date, as it has already been unduly prolonged. The court remands the case with great reluctance. We note here that the defendant is now under life sentence upon conviction of murder in Butler County; the appeal taken from that judgment was dismissed on February 11, 1963.

The judgment of the trial court denying defendant's motion to vacate is reversed for the reasons specifically stated herein; the original judgment of conviction and sentence are vacated and set aside, and the cause is remanded to the Circuit Court of Bollinger County for a new trial. Defendant will remain in the custody of the Department of Corrections until taken under appropriate process for retrial.

HYDE, HOLMAN, HENLEY, FINCH and DONNELLY, JJ., concur; STORCKMAN, C. J., concurs in result in separate concurring opinion filed.

STORCKMAN, Chief Justice (concurring in result only).

The limited examination I have been able to make of the law and the evidence in the time available inclines me to the following beliefs.

1. The rules announced in the principal opinion are broader than necessary for the disposition of the case and appear to impose a greater duty of disclosure on the prosecution than any decision thus far rendered by the Supreme Court of the United States.

2. In any event, the instant case can properly be decided on the narrower proposition, recognized by Missouri law, that a conviction may be set aside and a new trial awarded where the state has knowingly used false or perjured evidence.

3. Since the death penalty was imposed by the trial court under the Habitual Criminal Act, § 556.280, RSMo 1959, V.A. M.S., a determination should be made whether the rehearing should be limited to the issue of punishment and not the question of guilt which was determined by the jury.

The principal rule which I believe to be too broadly stated is as follows (Op. 700): "Various courts have held that the suppression of (or failure to disclose) evidence in the possession or control of the prosecution which is favorable to defendant and which might be persuasive to a jury, constitutes such a fundamental unfairness as to invalidate a conviction because violative of due process." Out of context, this imposes on the prosecutor the duty of determining what evidence or information he has favorable to the defendant and persuasive to the jury at the risk of having a conviction set aside if he does not make a disclosure. I doubt if the statement of the rule by the Supreme Court of the United States is that extensive.

The opinion cites various federal court cases but the decisions of the Supreme Court which are most recent and seem most applicable are Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9, and Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

In Alcorta v. State of Texas, the defendant was convicted of killing his wife by stabbing and was sentenced to death. He admitted the killing but claimed it occurred in a fit of passion when he discovered his wife, whom he had suspected of infidelity, kissing one Castilleja late at night in a parked car. Under Texas law, a killing in a fit of passion due to adequate cause would be murder without malice, punishable by a maximum sentence of five years' imprisonment. Castilleja in fact had had sexual intercourse with the defendant's wife five or six times shortly before her death. He gave this information to the prosecutor who told him not to volunteer the information about the intercourse but if specifically asked to tell the truth. At the trial Castilleja, the only eyewitness to the killing, testified for the state in substance that he and the defendant's wife were not in love with each other, that they had never talked about love, that he had never had any dates with her except to bring her home a couple of times, that on the night she was killed he had driven her home and was parked in front of her house at 2 o'clock in the morning because of engine trouble. His testimony gave the impression that his relationship with her had been nothing more than that of casual friendship. Sometime after the defendant's conviction had been affirmed, Castilleja "issued a sworn statement in which he declared that he had given false testimony at the trial." 355 U.S. at p. 30, 78 S.Ct. at p. 105. In its Per Curiam opinion, the Supreme Court of the United States gave its ruling and decision as follows: "It cannot seriously be disputed that Castilleja's testimony, taken as a whole, gave the jury the false impression that his relationship with petitioner's wife was nothing more than that of casual friendship. This testimony was elicited by the prosecutor who knew of the illicit in-

tercourse between Castilleja and petitioner's wife. Undoubtedly Castilleja's testimony was seriously prejudicial to petitioner. It tended squarely to refute his claim that he had adequate cause for a surge of 'sudden passion' in which he killed his wife. If Castilleja's relationship with petitioner's wife had been truthfully portrayed to the jury, it would have, apart from impeaching his credibility, tended to corroborate petitioner's contention that he had found his wife embracing Castilleja. If petitioner's defense had been accepted by the jury, as it might well have been if Castilleja had not been allowed to testify falsely, to the knowledge of the prosecutor, his offense would have been reduced to 'murder without malice' precluding the death penalty now imposed upon him." 355 U.S. at pp. 31–32, 78 S.Ct. at p. 105. The judgment denying the petition for a writ of habeas corpus was reversed and the cause remanded for further proceedings. On its facts, the Alcorta case does not necessarily go beyond the rule that a trial is constitutionally unfair when false and misleading testimony is knowingly used.

In Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the defendant was convicted of murder in the first degree and sentenced to death. At his trial he admitted participating in the killing but claimed his companion did the actual shooting. In his summation to the jury, defendant's counsel conceded that the defendant was guilty of murder in the first degree and requested only that capital punishment be not imposed. Before trial the defendant's counsel had requested the prosecution to permit examination of extrajudicial statements of the defendant's companion. Several were exhibited; but one in which the companion had admitted the actual killing was withheld by the prosecution and did not come to the defendant's notice until after his conviction had been affirmed. In a post-conviction proceeding, the Maryland Court of Appeals, 226 Md. 422, 174 A.2d 167, held that the suppression of the evidence by the prosecutor denied the petitioner due process of law. It remanded the case for a new trial on the question of punishment alone since it was of the opinion that nothing in the suppressed confession could have reduced the offense below murder in the first degree. On certiorari the Supreme Court of the United States held that the defendant had not been denied a federal constitutional right when his new trial was restricted to the issue of punishment and the judgment was affirmed. The opinion of the Supreme Court reviewed the evolution of the rule from the use of perjured testimony through the stages of suppression of favorable evidence and allowing false evidence to go uncorrected to the one presently applicable as follows (373 U.S. 87, 83 S.Ct. 1196): "We now hold that the suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Emphasis supplied. On the facts of this case and under these decisions of the United States Supreme Court, further statements on page 700 of the opinion seem broader than necessary.

On the facts set out in the present opinion and the prior opinion reported in 363 S.W.2d at 711, it appears that this appeal can properly be disposed of without any extension of the rules announced in these cases cited in the principal opinion: State v. Statler, Mo., 383 S.W.2d 534; State v. Eaton, Mo., 302 S.W.2d 866, and State v. Eaton, Mo., 280 S.W.2d 63. From the statement of facts of the previous appeal, it appears that: "A search was made at the scene of the shooting for bullets and spent shells, but none were found." 363 S.W.2d 714. This is an affirmative representation which now appears to be false in view of the statement in the present opinion that on the day following the killing two cartridge cases were found on the east side and one on the west side of the highway, and five were later found in the abandoned automobile used by the defendant and Tucker. The prosecutor knew, if the witness did not,

that the testimony at the trial was not true and under the rule of State v. Statler the prosecutor was obligated "to correct it then and there." 383 S.W.2d 537. See also Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Such a correction would have led to a disclosure of all events connected therewith including the ballistic tests.

Whether the undisclosed evidence was material and hence prejudicial would depend on whether the defendant had the Browning automatic in his possession and not a revolver which did not eject spent shells, and whether the Walther automatic was used only by Tucker. The defendant is the only living person who knows what gun he had and whether he fired it. It was admitted that the defendant had a gun and there was direct evidence that he fired it. The evidence that all of the spent shells found at the scene and in the automobile came from the Walther gun would not have erased this direct evidence and exculpated the defendant. Some of the ejected shells from the automatic fired outside may have landed in the car, and there can hardly be any doubt that any shots fired from inside the car during the getaway were fired by the defendant and not by Tucker who was driving. On the facts shown by the opinions, I am not persuaded that we should hold that the defendant has demonstrated that he was deprived of a fair trial because of the state's failure to disclose the finding of the spent shells and the results of the ballistic tests. The undisclosed evidence only tended to prove that the Walther gun was fired at the scene of the crime. It did not tend to prove or disprove that the defendant had that gun in his possession, that he did not fire it, or that the gun he had did not eject shells. It did not tend to refute the state's evidence that the defendant fired a gun or support the defendant's contention that he did not. The statements of the prosecutor to the jury and his argument based on the assumption that no spent shells were found were improper and are not to be condoned, but standing alone they can hardly be said to deprive the defendant of a fair trial in view of the evidence in the case. The comments are more in the nature of trial errors reviewable on appeal.

Even if the combination of the failure to correct false or untrue testimony plus the prosecutor's argument based thereon were held to spell out a constitutionally unfair trial violating due process of law, it does not follow that the judgment of conviction should be set aside and a new trial granted on all issues. The crime involved in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, was murder committed in the perpetration of a robbery for which the punishment was life imprisonment or death. The jury could restrict the punishment to life imprisonment by adding to its verdict the words "without capital punishment" which the jury did not do and the death penalty was assessed. The Maryland Court held the suppression of the confession of defendant's companion that he fired the shot on which the murder charge was based could not have reduced Brady's offense below first-degree murder and limited the retrial to the issue of punishment. The action was affirmed by the United States Supreme Court on the theory that the holding was a ruling that the confession would not have been admissible on the issue of guilt or innocence. This raises the question whether any possible new trial in the present case could properly be so limited. If the state had offered the evidence in question, it might have been excluded if the defendant had objected on the ground it was immaterial unless the state also showed that the defendant had possession of the Walther gun. If offered by the defendant, it is doubtful that the trial court would have been convicted of error in excluding it on the theory that it did not prove the defendant did not fire a shot or substantially corroborate his contention that he did not. At most it would have been corroborative evidence in which area the trial court has some discretion regarding its admissibility.

 

As stated, my view is that the majority opinion goes beyond what is required by the Supreme Court of the United States. I do not deem it advisable to try to keep pace with the various United States Courts of Appeals because they have differed in the application of the rules of law just as the state courts have. I doubt if any decision of the Supreme Court of the United States compels the result reached by the majority opinion.

Nevertheless, in view of the aggregate facts and circumstances shown by the evidence and by applying a narrower and better established rule, I can agree with the ultimate holding of the majority opinion that the defendant was deprived of a trial consistent with due process of law, but I do not subscribe to the broad rules announced in reaching that result.

Therefore, I concur in the result only.